PRESTIGE CASUALTY CO., Plaintiff,

v.

MICHIGAN MUTUAL INSURANCE, Defendant.

No. 93–CV–71495.

United States District Court,
E.D. Michigan,
Southern Division.

July 20, 1994.

David S. Anderson, Bloomfield Hills, MI, for plaintiff.

Christopher L. Terry, Detroit, MI, for defendant.

## OPINION AND ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This declaratory judgment action was brought by Plaintiff Prestige Casualty Company ("Prestige") to hold Defendant Michigan Mutual Insurance Company ("MMI") solely liable for insurance coverage of an accident which occurred on October 8, 1985. MMI filed a counterclaim asking this Court to hold Prestige solely liable for coverage of the accident, or, in the alternative, to hold that Prestige must reimburse MMI for any coverage liability it may have. The Court has jurisdiction over this matter by virtue of the diversity of the parties.

Prestige filed a motion for summary judgment on June 9, 1993. MMI filed a cross-motion for summary judgment on July 15, to which Prestige responded on August 6. Oral arguments were heard on this matter on February 17, 1994, and, after further review of the parties' briefs and further reflection upon counsels' oral arguments, the Court is now prepared to rule on the cross-motions. This memorandum opinion and order sets forth that ruling.

### II. FACTUAL BACKGROUND

The facts of this case are undisputed. Pursuant to a lease dated June 11, 1985, George Bogle, a lessor of trucks, leased one of his vehicles to Wolverine Expediting, Inc. ("Wolverine"), a licensed interstate transportation company which operated under Interstate Commerce Commission ("ICC") regulations.[1] The lease provided as follows:

> The Lessee shall exercise exclusive supervision, direction, and control over the operation of the equipment under this lease;
>
> The Lessee shall hold exclusive possession and control over the equipment under this lease for the entire term of the lease;
> * * *
>
> The Lessee shall operate the equipment under lease with persons who are employees of such Lessee and who stand in relation to such Lessee as employee to employer;
>
> The Lessee shall be responsible for all claims for damages, or otherwise, arising out of the operations of this equipment during the full period of the lease;
>
> The Lessee shall secure ample and adequate insurance satisfactory to the Michigan Public Service Commission covering the operation of the said equipment during the full period of the lease.

*See* Prestige's Brief, Exhibit B ("Lease").

After the lease was signed, lessor Bogle hired Gregory Freed to drive the truck. Bogle paid Freed a percentage of the money he made on each trip. On July 9, 1985, also following the signing of the lease, Bogle entered into an automobile liability insurance agreement with Prestige which covered, *inter alia*, the truck leased to Wolverine. Wolverine, for its part, purchased truckers insurance from MMI on September 13, 1985. The MMI policy, which was effective for the period from July 10, 1985, to July 10, 1986, covered, *inter alia*, all trucks leased by Wolverine.

On October 8, 1985, Freed was driving the truck east on I–96 near Grand River Avenue in Wayne County, Michigan. As he was

---

1. Wolverine, apparently, is no longer a going concern. MMI has represented that it was discharged in bankruptcy several years ago, and thus would not have to pay any judgment not covered by liability insurance. *See* MMI Brief, p. 33.

changing lanes, Freed struck the car of Ronald J. Paul. Paul was seriously injured as a result of the accident. Freed was issued a citation for the accident.

At the time of the accident Freed was driving the truck on Bogle's behalf. According to Freed's deposition, Bogle told him that he wanted to try to lease the truck to Frostways, Inc., another trucking company, and that he should meet Bogle at its terminal. MMI's Brief, Ex. F, p. 39. Bogle, for his part, offered the following testimony:

Q. Can you tell me what was the purpose of Mr. Freed's trip at the time that he was using the equipment on the day this accident happened?

A. He was going down to Detroit to see if he could get a load since we weren't doing anything for Wolverine. * * *

Q. You indicated earlier that your relationship [with Wolverine] had just about "petered out," I think were the words you used, before this accident happened. Is that right?

A. Well, what I did, I went to a [Wolverine] dispatcher and told them, I said, hey, I got to do something. And he said, fine. It's slow. I'll turn your card around or something like that. And if I get to where I really need you, I'll give you a call. If you can find something for a few days, fine. So that was the situation that was—he simply didn't have any work at that time. And that he would just treat me as though I had my truck in for repair. So that if I picked up a load, that it wouldn't conflict. In other words, he wouldn't be depending on me to be ready at a moment's notice.

See MMI's Brief, Exhibit E, pp. 17–19. Despite the testimony on what the truck was doing at the time of the accident, it is also undisputed in this litigation that (1) the lease to Wolverine was still effective, (2) Wolverine consented to Bogle and Freed's use of the truck, and (3) Wolverine's placards remained on the truck at all times relevant to this action.

Mr. and Mrs. Paul filed suit in Wayne County Circuit Court against Bogle, Wolverine, and Freed. Plaintiffs in that action stipulated to the dismissal of Wolverine, whereupon Bogle and Freed—both represented by Prestige's counsel—filed a third-party complaint. In that complaint, Bogle and Freed alleged that Wolverine was primarily liable for plaintiffs' damages as a result of applicable ICC regulations. Wolverine counterclaimed alleging that Freed must indemnify it for any monies it might owe Bogle. Wolverine was represented in all proceedings by MMI's counsel in this action.

Upon motions for summary disposition, the state trial court found that ICC regulations did impose primary liability for the accident upon Wolverine. Furthermore, the trial court rejected Wolverine's claim for indemnification from Freed, holding that Freed was a statutory employee of Wolverine.

Wolverine appealed the decision. Even though Bogle and Freed were the winners in the trial court, they settled with plaintiffs for some $225,000.00 before the Court of Appeals rendered its decision. Prestige paid Mr. and Mrs. Paul this sum.

The Michigan Court of Appeals affirmed the trial court ruling in part and reversed in part. *Paul v. Bogle*, 193 Mich.App. 479, 484 N.W.2d 728 (1992). In a lengthy opinion, the court held (1) that Wolverine was indeed liable for the accident pursuant to ICC law making Freed a statutory employee of Wolverine at the time of the accident and state law making Wolverine an owner of the truck at the time of the accident; (2) that Wolverine must indemnify Bogle pursuant to its lease with him; and (3) that Wolverine may be entitled to indemnity from Freed. 484 N.W.2d at 737–38.

The court began its analysis by noting ICC regulations in place at the time of the accident mandated that lease agreements between vehicle owners and licensed interstate carrier state that:

the authorized carrier lessee shall have exclusive possession, control and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of

the equipment during the duration of the lease.

484 N.W.2d at 731 (quoting 49 C.F.R. § 1057.12(c)(1)). As noted above, the lease between Bogle and Wolverine contained clauses to this effect. *See supra* Lease.

The court also found that the lease was still in effect at the time of the accident. This ruling was based on the fact that Wolverine did not comply with the applicable ICC regulations on terminating leases. Those regulations required a lessee to obtain a receipt from the owner upon surrender of the truck, and also mandated that the lessee remove any identifying placards prior to surrender. 484 N.W.2d at 735 (citing 49 C.F.R. §§ 1057.12(b)(2) & (c)(1) (1985)). Because Wolverine did not take either of these steps, the court held that there was no termination of the lease. 484 N.W.2d at 735.

The *Paul* court went on to adopt in part the "statutory employee" doctrine which holds an ICC carrier:

> vicariously liable for injury, caused by the driver's negligent operation of a vehicle, when three factors coincide: (1) the carrier does not own the vehicle; (2) the carrier operates the vehicle, under an arrangement with the owner, to provide transportation subject to the [ICC's] jurisdiction; and (3) the carrier does not literally employ the driver. In these circumstances, the driver is held to be a *constructive* or "statutory" employee of the carrier; and, in consequence of this fiction, the doctrine of *respondeat superior* imposes upon the carrier a vicarious liability for the negligence of its "employee," the driver.

484 N.W.2d at 732–33 (quoting *John B. Barbour Trucking Co. v. Texas*, 758 S.W.2d 684, 688 (Tex.Ct.App.1988) (emphasis in original)). The *Paul* court then noted:

We do not believe that the statutory employee doctrine, adopted by a substantial number of jurisdictions, imposes liability solely on the basis of the ICC regulations. Rather, the doctrine appears to impose liability under state law, after creating the fictional relationship existing between the driver and the ICC carrier. * * * We accordingly adopt that portion of the statutory employee rule that creates a fictional employment relationship between the driver and carrier and then look to the applicable state law for the imposition of liability.

484 N.W.2d at 733.

The *Paul* court continued:

Having determined that Wolverine is potentially liable under the statutory employee doctrine for Freed's negligence, we next address the question, "What is the applicable Michigan law?" Under the Vehicle Code, M.C.L. § 257.1 *et seq.*; M.S.A. § 9.1801 *et seq.*, an owner of a motor vehicle includes any person or entity having the exclusive use of a motor vehicle under a lease for more than 30 days. M.C.L. § 257.37(a); M.S.A. § 9.1837(a). An owner of a motor vehicle is liable for any injury occasioned by the negligent operation of the vehicle, unless the vehicle is being driven without the owner's "express or implied consent or knowledge." M.C.L. § 257.401(1); M.S.A. § 9.2101(1).[2]

Given that the lease agreement between Bogle and Wolverine granted Wolverine the exclusive use of the truck for a period of not less than thirty days, we believe that there can be no dispute that Wolverine constituted an owner of the vehicle under M.C.L. § 257.37; M.S.A. § 9.1837. We also believe that Wolverine's failure to remove its identifying placards and to re-

---

**2.** This statute was amended in 1988 to include the following provision:

> A person engaged in the business of leasing motor vehicles who is the lessor of a motor vehicle pursuant to a lease providing for the use of the motor vehicle by the lessee for a period that is greater than 30 days shall not be liable at common law for damages for injuries to either the person or property resulting from the operation of the leased motor vehicle.

M.C.L. § 257.401(2). M.C.L. §§ 257.37 (defining "owner" for Motor Vehicle Code); 257.401a (de-

fining "owner" for purposes of civil liability in Motor Vehicle Act to exclude long-term lessors) and 500.3101 (defining "owner" for purposes of no-fault automobile insurance) were also modified by the 1988 amendment to exclude long-term lessors from the class of motor vehicle owners. Under the prior provisions in the Michigan Code, Bogle would have been an "owner" for purposes of civil liability and insurance requirements.

quest, in accordance with ICC regulations, a receipt for surrender of the vehicle constitutes its implied consent to Bogle and Freed to utilize the truck for whatever purposes the vehicle was being used at the time of its collision with Paul's vehicle. Such a conclusion is also supported by our holding that Wolverine was Freed's statutory employer. Accordingly, we find that, under applicable state law, Wolverine was liable as an owner of the vehicle.

484 N.W.2d at 733–34.

Important to this action, the court specifically rejected Wolverine's argument that it should not have any liability because Freed was driving the truck on behalf of Bogle and not Wolverine at the time of the accident. The court stated:

> [W]e reject Wolverine's assertion that the disputed fact that Freed was driving the truck on Bogle's business, and not Wolverine's, at the time of the accident relieves it of any liability. The applicable statute, when taken into consideration with Wolverine's duties under the applicable ICC regulations, precludes the success of such an argument. Under ICC regulations, Wolverine continued to consent to the use of the vehicle, no matter whose business or interests were pursued, as long as the identifying placards remained on the vehicle and Wolverine had not obtained a receipt from Bogle or his agent for the return of the vehicle. Given this implied consent, it is immaterial whose business was being pursued at the time of the accident.

484 N.W.2d at 734.

Lastly, the state appellate court ruled on issues of indemnification. With respect to Bogle's claim for indemnification from Wolverine, it held that Wolverine was obligated to indemnify Bogle under the ICC-mandated terms of the lease. 484 N.W.2d at 735. In the court's opinion, however, Freed was not an intended third-party beneficiary of the lease agreement between Bogle and Wolverine, and, thus, Wolverine need not indemnify him. The court also held, however, that Wolverine might be entitled to indemnity from Freed:

> We hold that, even as Freed's constructive employer, Wolverine is entitled to "seek contribution or indemnification from other potentially responsible parties," including Freed. . . . Such a holding in no way undermines the purpose underlying the ICC regulations. The innocent victim is entitled to prompt compensation from an easily identifiable responsible party. However, nothing in the ICC regulations precludes a carrier from seeking recovery from another party who may also be at fault. . . . Accordingly, we conclude that the trial court erred in granting Freed's motion for summary disposition of Wolverine's countercomplaint for common-law indemnification.

484 N.W.2d at 737.

The parties to the *Paul* case attempted to get before that court the issues that this Court faces today, namely, which insurance company must pay whom. The *Paul* court, however, refused to hear this matter because the parties to this action were not parties in *Paul.* 484 N.W.2d at 738.

On remand from the appellate court, the state trial court entered an order on February 5, 1993, which mandated that Wolverine pay Bogle $251,428.67, plus interest, pursuant to the indemnification clause in the lease agreement. *See* MMI's Brief, Ex. D. That sum equals the $225,000 settlement paid to Mr. and Mrs. Paul, plus a reasonable attorney fee. The court also ordered that Freed pay Wolverine the same sum on the ground of common law indemnification, ostensibly because Freed's negligence was the proximate cause of Paul's injuries. *Id.* Freed has appealed this second ruling. Also apparently on appeal is the question of whether Wolverine's liability to Bogle is strictly contractual or based on a vicarious liability theory.

In the instant action before this Court, Prestige asks this Court to do the following:

1. Enter a declaratory judgment that MMI's insurance policy provides primary coverage to pay for Wolverine's liability to Bogle.

2. Enter declaratory judgment that MMI's insurance policy provides pri-

mary coverage to pay for Freed's liability to Wolverine.

3. Enter declaratory judgment that Prestige's insurance policy does not provide coverage for any liability arising from the accident.

4. Enter declaratory judgment in favor of Prestige for ⅔ of the $251,428.67, plus interest, should the Court find that the Prestige and MMI policies are co-primary. The two-thirds figure is derived from the policy language in both the Prestige and MMI policies.

MMI, for its part, asks the Court for the following:

1. Entry of declaratory judgment that Prestige had the primary obligation to cover Bogle and Freed; thus Prestige cannot recover from MMI.

2. Entry of declaratory judgment that Wolverine was an additional named insured on the Prestige policy.

3. Entry of declaratory judgment that MMI is entitled to reimbursement from Prestige for any liability on the ground of any one of the following theories:

   a. The "Our Right to Recover from Others" provision in MMI's policy.

   b. Equitable subrogation and the common law.

   c. Language contained in an ICC-mandated endorsement which was contained in MMI's policy.

## III. ANALYSIS

### A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the

---

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure,* § 2727, at 35 (Supp.1994).

respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

See *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding the parties' cross-motions for summary judgment.

### B. *THE PARTIES ARE COLLATERALLY ESTOPPED FROM RELITIGATING ISSUES DECIDED IN THE STATE COURT ACTION.*

It is well-established Michigan law that parties, or their privies, are collaterally estopped from re-litigating issues which were decided in a prior action after a full and fair opportunity to contest them. This principle was stated succinctly in *Marino v. McDonald*, 611 F.Supp. 848 (E.D.Mich.1985):

> Under Michigan law, "collateral estoppel will bar the relitigation of issues actually litigated and determined in the first suit where there is a 'substantial identity' of parties." ... When, in an earlier proceeding, a material issue directly involved in that proceeding has been resolved against a party, Michigan law prevents the losing party from relitigating that issue in a subsequent action.

611 F.Supp. at 854 (citations omitted).

■ The Court holds that the parties to this action should be barred from relitigating the issues decided in *Paul v. Bogle*, analyzed *supra*. Although the parties to that action were not the insurance companies litigating this case, the Court believes that they have a substantial identity to the parties in *Paul*, and that, therefore, they should be bound by its rulings.[4]

The Court draws support for its conclusion from *Guarantee Ins. Co. v. Great American*

---

*Indemnity Co.*, 163 F.Supp. 320 (E.D.Mich. 1958) (Freeman, J.). In that case, plaintiff's insured (West Side Motors), a car dealership in Michigan, bought a car from defendant's insured (Ford & Son), a car dealership in California. Ford & Son made arrangements with a transportation company (Hayes) to ship that car to West Side Motors, but while in transit in Arkansas, the driver employed by the Hayes got into an accident. The people in the car struck by the driver brought a negligence suit in Arkansas federal district court against Hayes, West Side Motors, and Ford & Son. West Side Motors and Ford & Son each claimed that the other owned the car at the time of the accident. The disputed ownership was important, because governing law in the Arkansas case permitted out-of-state service of process only upon the owner of the vehicle. 163 F.Supp. at 321–22.

The trial court in the negligence suit held that the car belonged to West Side Motors at the time of the accident. Ford & Son was, therefore, dismissed for improper service, and judgment for $75,000 against West Side Motors was entered. Plaintiff, West Side Motors' insurer, paid the judgment. 163 F.Supp. at 322.

Plaintiff then sued defendant, Ford & Son's insurer, in federal court claiming that West Side Motors was an additional insured on Ford & Son's insurance policy. Plaintiff, therefore, demanded that defendant pay it the full $75,000 judgment. 163 F.Supp. at 323.

Judge Freeman dismissed plaintiff's suit. Ford & Son's insurance policy clearly excluded automobiles owned by other companies or individuals. Thus, if the state court decision that West Side Motors was the owner of the car was binding on the plaintiff as well as on West Side Motors, then plaintiff had no case.

Judge Freeman held that indeed plaintiff was collaterally estopped from challenging the state court's decision that West Side Motors was the owner of the car. In his words:

the instant parties' counsel.

---

4. Indeed, as noted above, the record reflects that the parties in *Paul v. Bogle* were represented by

After lengthy consideration of the facts and law, the Arkansas court ruled that West Side was the owner and that service of process on Ford was not valid and therefore granted Ford's motion to quash [service]. West Side and Ford were adversaries in the presentation and determination of that issue. The insurance companies now before this court are unquestionably privies of Ford and West Side and neither party to this lawsuit contests that fact. * * *

It seems clear ... that, where an issue is presented to this court that is essential to a decision of a case and that issue has been decided in a previous case by a court of competent jurisdiction and the parties before this court or their privies were adversaries as to that issue in the previous case, the doctrine of collateral estoppel will prevent any further litigation of that issue in this court. It is not denied that the Arkansas court was a court of competent jurisdiction in deciding this issue of ownership. Therefore, it is unnecessary to discuss the other issues involved.

Plaintiff's claims in this suit are based upon its status as assignee of the claim of West Side against defendant. It is clear that West Side can have no right against defendant unless it qualifies as an "additional insured" within the meaning of the insurance contract and it is also clear that the insurance contract expressly excludes any "additional insured" from coverage if it is an owner of the auto. For the reasons stated above, plaintiff, as West Side's privy, is collaterally estopped from denying West Side's ownership of the auto because of the judgment of the District Court for the Eastern District of Arkansas, and the court renders a verdict for defendant of no cause of action.

163 F.Supp. at 324.

The Court agrees with Judge Freeman that insurance companies are stuck with the decisions rendered in suits litigated by their insureds. Such reasoning is especially applicable to this case, where the same counsel before this Court represented the parties in *Paul*. Prestige and MMI are, therefore, bound by what happened in the *Paul* case.

As set forth above, *Paul* established that Wolverine was liable for the accident as a result of the interplay between Michigan law and governing ICC regulations and regardless of what Freed was doing or for whom at the time of the accident. Therefore, the court affirmed the trial court's ruling that Wolverine must indemnify Bogle under the ICC-mandated terms of their lease agreement. Moreover, on remand the trial court held that Wolverine enjoyed common law indemnification from Freed. Although this second ruling is subject to a pending appeal, it is still the law of the case for purposes of this action. The Court will thus assume for the purposes of this action that it was Freed's negligence which was the proximate cause of Paul's injuries.

*Paul*, however, expressly left open the issue of insurance coverage for the two outstanding judgments in this case: Bogle's judgment against Wolverine, and Wolverine's judgment against Freed. To that question, the Court now turns.

## C. WOLVERINE AND FREED ARE INSUREDS UNDER BOTH THE PRESTIGE AND MMI POLICIES.

As an initial matter, it is clear from the policies that the truck Freed was driving at the time of the accident was a "covered auto" under both policies. MMI's policy provided liability insurance for the truck as a "hired" auto, which was defined as "those autos you [Wolverine] lease, hire, rent, or borrow." *See* MMI Policy, Declaration Page, Form CA 00 02. The Prestige policy, for its part, specifically listed the truck driven by Freed as one of Bogle's "covered autos." *See* Prestige Policy, p. 1.

In light of the fact that both policies cover the truck in this case, the next issue to address is which of the parties against whom judgment has been entered, i.e., Wolverine and Freed, are insureds under which policy.

■ The Court's reading of the Prestige and MMI policies suggests that Freed and Wolverine are insureds under both policies. First, with respect to Freed, the Court finds that he is an additional insured under both the Prestige and MMI policies by virtue of

the following language contained in both policies: "Anyone else is an insured while using with your permission a covered auto you own, hire or borrow ..." *See* MMI Policy, Form CA 00 12, p. 2; Prestige Policy, CA 00 19. In *Michigan Mutual Liability Co. v. Ohio Casualty Ins. Co.*, 123 Mich.App. 688, 333 N.W.2d 327, 330 (1983), the Michigan Court of Appeals held that coverage clauses like the one above should be construed broadly:

> The language of the omnibus [person's insured] clause is
>
> to be construed broadly to effectuate a strong legislative policy of assuring financial protection for innocent victims of automobile accidents.... The phrase "using an automobile", for the purposes of the omnibus clause, is not limited to operating or having the benefit of the automobile, but includes doing something "to or with" an automobile.

333 N.W.2d at 330. *Michigan Mutual* went on to hold that someone attempting to tow an insured vehicle was "using" it, and therefore qualified as an insured under the vehicle owner's policy. 333 N.W.2d at 331.

Applying *Michigan Mutual* to the contract language in the instant case, it cannot be disputed that Freed was using, i.e., operating, a covered auto owned by Bogle and hired by Wolverine with their permission at the time of the accident. Thus, under the plain terms of both policies, Freed is an insured under these policies.

■ Turning now to Wolverine, as named insured under the MMI policy, it is, of course, covered by that policy. The Court also believes that Wolverine is an insured under the Prestige policy because of the following language: "Anyone liable for the conduct of an insured described above is insured but only to the extent of that liability." *See* Prestige Policy, CA 00 19.

Prestige argues that this clause does not apply because Wolverine's liability to Bogle arises strictly from its lease with Bogle and not from its relationship to Freed. Indeed, the state appellate opinion and the trial court order do indicate that Wolverine's liability to Bogle is based at least in part on contractual indemnification. *See Paul*, 484 N.W.2d at 735; MMI's Brief, Ex. D, p. 2. However, it is undisputed that any liability Wolverine may have springs from Freed's conduct. Thus, the Court believes that the above clause applies to include Wolverine among the additional insureds under the Prestige policy.

■ Prestige argues further that Wolverine is not an insured under its policy because of the following clause:

> None of the following is an insured: (1) Any trucker or his or her agents or employees, other than you and your employees: a. If the trucker is subject to motor carrier insurance requirements and meets them by a means other than auto liability insurance.

*See* Prestige Policy, Endorsement CA 00 19. Prestige argues that MMI's "truckers" insurance is not the same as "auto liability insurance," and, thus, Wolverine falls outside of the class of insureds under Prestige's policy.

The Court finds this exclusion inapplicable. Prestige offers no law or facts supporting the distinction it attempts to draw between "truckers" insurance and "auto liability" insurance. Indeed, the terms "auto" and "truck" are used loosely in both the Prestige policy and the MMI policy. The trucks covered under both contracts are named "covered autos," and Prestige's policy contains "truckers endorsements" even though, according to its counsel, it is not truckers insurance. Absent additional facts and law behind Prestige's argument, the Court will construe this provision against its drafter and hold that it does not exclude Wolverine from the class of additional insureds.

Having established that Wolverine and Freed are insured's under both the Prestige and MMI policy, the Court will now consider whether one or both of those policies provide them coverage.

### D. BOTH POLICIES PROVIDE COVERAGE FOR THE WOLVERINE AND FREED JUDGMENTS.

Both the Prestige and MMI policies have broad coverage clauses. Prestige's clause states:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance, or use ... of an owned automobile ...

*See* Prestige Policy, Declarations, p. 1. The MMI policy, for its part, states:

We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.

*See* MMI Policy, Form CA 00 12, p. 2.

On their face, these clauses provide coverage to Wolverine and Freed for the accident. The truck which was involved in the accident was a covered auto under both policies, and was in use with Wolverine and Bogle's permission at the time of the accident. Thus, unless the parties can point to specific exclusions in their policies, they both must provide coverage for the liabilities generated by the Freed–Paul collision.

Prestige relies upon the clause contained in Endorsement CA 23 10 to exclude coverage for this accident. That clause states (emphasis added): "Liability insurance does not apply while the covered auto is *used in the business of anyone to whom it is leased or rented* if the lessee has liability insurance sufficient to pay for damages in accordance with Chapter 31 of the Michigan Code." Prestige argues that this clause clearly saves it from providing coverage because it is undisputed that Wolverine leased the truck and that it had enough insurance to cover the injuries caused by the Freed–Paul accident.

■ Prestige's argument goes too far too quickly. The "used in the business" endorsement states that trucks used in the business of lessees with enough insurance are exempted. If Freed had been driving or seeking a load for Wolverine at the time of the accident, there is no question that Prestige's policy would not apply. The undisputed facts of this case, however, indicate that Freed, while acting with the permission of

Wolverine, was seeking a load to benefit himself and Bogle. In light of this fact and the plain meaning of the endorsement, the Court cannot find that it excludes Wolverine from coverage under Prestige's policy.

The Court does not agree with Prestige that *Planet Ins. Co. v. Transport Indem. Co.*, 823 F.2d 285 (9th Cir.1987), suggests a contrary result. That case is almost identical to this one in that the insurance company of a truck lessor/operator sought declaratory judgment that the lessee's insurer was primarily liable for coverage of an accident because of the same ICC regulations discussed in this case. The *Planet* court held, *inter alia*, that the lessor/operator's insurance policy properly excluded the lessee from insured status because of a "used in the business" clause identical to the one in this case. The critical difference between *Planet* and this case, however, is that in *Planet* the lessor/operator of the truck was on his way to pick up a load for the lessee at the time of the accident. 823 F.2d at 288–89.

Here, the record clearly indicates that Freed was on the road seeking a load for Bogle (and himself) pursuant to Bogle's instructions as a result of the fact that Wolverine did not have work for the truck. While this fact does not exempt MMI from liability given its policy's broad coverage clause and Wolverine and Freed's status as insureds, it does vitiate a finding that the truck was used "in the business" of Wolverine at the time of the accident.

Further support for the Court's holding that Prestige cannot escape some coverage of this accident under Endorsement CA 23 10 can be found in Bogle's understanding of the Prestige insurance policy, the language of that policy, and relevant case law. Bogle's deposition testimony reveals exactly why he purchased insurance on this truck despite the fact that the lease he had negotiated with Wolverine required MMI to insure the truck. Simply put, Bogle wanted his own insurance for those times when his vehicles were "bobtailing," *i.e.*, not carrying loads for lessees—precisely the situation in this case. His deposition states:

Q. At the time of this accident, did you have, I guess it would be truck insurance on that vehicle?

A. I had the insurance to cover when it wasn't on a load, called bobtail insurance.

Q. And what type of insurance would cover your vehicle when it wasn't delivering for someone else?

A. Yes.

Q. Are you telling us, at that time of this accident, as best you know, your vehicle was not being used to deliver for Wolverine Expediting?

A. Yes.

Q. Yes, it was not?

A. It was not.

Q. That was a bad question on my part. If your vehicle was being used for delivery, or dispatch as you said, who would insure this vehicle at that time?

A. Whoever the load was that I was pulling.

*See* MMI's Brief, Exhibit E, pp. 12–13 (Bogle Deposition).

Prestige argues that the Court should disregard Bogle's testimony of what he was paying premiums for because that is not what the contract says. However, Prestige is incorrect. Endorsements to the Prestige policy adding and deleting vehicles from coverage contain a line which reads: "ADDED/DELETED *BOBTAIL LIABILITY LIMITS* AND PHYSICAL DAMAGE DEDUCTIBLES." *See* Prestige Policy, Coverage Endorsements (emphasis added).

Numerous courts have noted that "bobtail" insurance is exactly what Bogle believed it to be: insurance for those times when a leased truck is doing non-lease work. For example, in *Hartford Ins. Co. v. Occidental Fire & Casualty Co.*, 908 F.2d 235 (7th Cir.1990), the Seventh Circuit confronted a case similar to this one in which the insurer (Hartford) of a truck lessee (Lykes Transport) sought indemnification from the insurer (Occidental) of a truck owner (Rich Transport) for an accident. At the time of the accident, the driver of the truck (Dunn) was in the process of making a delivery for Lykes. He was also, however, conducting repairs on the truck pursuant to Rich's instructions. 908 F.2d at 236.

The *Hartford* court held that Occidental need not indemnify Hartford because of an exclusion in the Occidental policy:

The relevant clause in the [Occidental] policy excludes coverage "[w]hile the automobile is being used in the business of any person or organization to whom the automobile is rented." Occidental argues that Rich's equipment was "in the business of" Lykes at all times the lease was in effect because federal law required Lykes, as the lessee, to maintain exclusive control over leased vehicles. Federal law, it claims, operates to relieve it of liability whenever Rich's equipment was leased to another.

We disagree. The fact that Lykes was leasing the truck is evidence that it was being used in Lykes' business, but it is not dispositive. *To hold otherwise would render Rich's coverage a virtual nullity. The clear language of [the exclusion for use in the lessee's business] controverts Occidental's interpretation by protecting Occidental from liability only when (1) the vehicle is rented and (2) it is being used in the lessee's business. The contract clearly contemplates occasions on which the vehicle, though rented, would not be engaged "in the business" of another. At such times, Occidental's policy applies. As Hartford notes, Occidental could not avoid liability under its insurance contract had the accident occurred while Dunn was enjoying a "night on the town" in his rig simply because, at the time, it was rented to another company.*

908 F.2d at 238 (bold emphasis in original, underlining emphasis added; citations omitted). Even though the *Hartford* court rejected Occidental's defense that the ICC regulations automatically excluded it from coverage, it did uphold its exclusion clause defense because the truck was in the process of making a delivery for the lessee. 908 F.2d at 239. *See also McLean Trucking Co. v. Occidental Fire & Casualty Co.*, 72 N.C.App. 285, 324 S.E.2d 633, 636–37 (granting to truck lessee declaratory judgment that lessor's insurance policy provided coverage for bobtail-

ing in that case, namely, a trip by lessor to his home), *review denied,* 313 N.C. 603, 330 S.E.2d 611 (1985).

■ Reading *Hartford* and *McLean* together with the Prestige policy's reference to "bobtail liability" and Bogle's own understanding of the reason he was paying premiums, the Court finds additional grounds for its conclusion that Prestige cannot rely on Endorsement CA 23 10 to exclude this accident from coverage. Bogle purchased insurance from Prestige for just the type of accident that this case involves, and Prestige continued to take premiums from Bogle despite the lease of the truck to Wolverine.[5] Prestige should, therefore, not be allowed to escape some liability for coverage by making a highly technical, and factually inaccurate, argument that only Wolverine was using the vehicle at the time of the accident.

Prestige and MMI argue finally that both of their policies exclude coverage of "liability assumed [by the insured] under any contract or agreement...." *See* Prestige Policy, p. 1; MMI Policy, Form CA 00 12, p. 2.[6] The parties maintain that if Wolverine's liability to Bogle is deemed contractual, then this clause applies to exonerate them both from coverage of Bogle's judgment against Wolverine.

■ The Court holds that the "contract liability" clauses do not apply to knock out either Prestige or MMI's coverage of Wolverine. Although the state appellate and trial courts in *Paul* did apparently rely upon a contractual indemnification theory springing from the Bogle–Wolverine lease as the grounds for the judgment against Wolverine, their decisions were, in the Court's opinion, inextricably linked to the appellate court's analysis of Wolverine's liability for the accident as Freed's statutory employer as a statutory "owner" of the vehicle. If Wolverine's

liability were purely contractual, the *Paul* appellate court simply would not have had to engage in the extensive statutory employee and statutory owner analysis that makes up a large portion of that opinion.

Importantly, the Sixth Circuit has held in a similar case, albeit one applying Tennessee law, that where liability springs from both a contract and other principles, such as tort liability, then "contract liability" clauses like the ones in this case do not bar coverage. *See Colonial Refrigerated Transp., Inc. v. Worsham,* 705 F.2d 821, 827–28 (6th Cir. 1983). When read together, then, *Paul* and *Colonial* favor a holding that the "liability assumed under contract" exclusion in both policies should not be given effect.

Because neither party can rely upon any exclusion in their policies to avoid coverage of both the Wolverine and Freed judgments, the question now becomes which insurer is primarily liable. The next section will address that question.

### E. *MMI AND PRESTIGE MUST COVER THE WOLVERINE AND FREED JUDGMENTS ON A PRO RATA BASIS COMPUTED WITH RESPECT TO POLICY LIMITS.*

In the end, this case boils down to an analysis of the identical "other insurance" clauses found in both policies. Those clauses:

1. This policy's liability coverage is primary for any covered auto while hired or borrowed by you [7] and used exclusively in your business as a trucker and pursuant to operating rights granted to you by a public authority. This policy's liability coverage is excess over any collectible insurance for any covered auto while hired or borrowed from you by another trucker.

---

5. Prestige received a total of $10,523.00 in premiums from Bogle for the contract year. At least $333.00 of this was for liability insurance for the truck driven by Freed. *See* Prestige Policy, Declarations Page.

6. Only the Prestige policy contains the words "by the insured."

7. In the MMI policy, "you" is defined as "the person or organization shown as the named in-

sured in ITEM ONE of the declarations," i.e., Wolverine. *See* MMI Policy, CA 00 12, p. 1. The Prestige policy does not define the term, but the Court believes that the definition found in the MMI policy is consistent with the intent of the Prestige policy. "You" in the Prestige policy, therefore, refers to the named insured on that policy—George Bogle.

2. [Not applicable.]
3. Except as provided in Paragraphs 1 and 2 above, this policy provides primary insurance for any covered auto you own and excess insurance for any auto you don't own.

*See* Prestige Policy, Endorsement CA 00 19; MMI Policy, CA 00 12, p. 6. Before the Court can interpret the above language and apply it to the instant case, however, it must determine whether MMI can rely upon the "other insurance" clause found in its policy.

### 1. The ICC Endorsement Attached To MMI's Policy Does Not Bar It From Relying Upon Its "Other Insurance" Clause.

■ As an initial matter, Prestige argues that this Court should knock out the "other insurance" clause found in the MMI policy because of the attachment to that policy of an ICC-mandated endorsement. That endorsement, known as MCS–90, states:

It is understood and agreed that no condition, provision, stipulation or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.

*See* 49 C.F.R. § 387.15. Prestige contends that the language of the MCS–90 endorsement vitiates any liability limiting language— such as the "other insurance" clause—found in MMI's policy. MMI counters that the MCS–90 endorsement should have no effect in cases apportioning liability between two insurers after claims by members of the public have been satisfied.

The Sixth Circuit has yet to discuss the impact of the MCS–90 endorsement on disputes between two insurers. However, the majority of circuits that have considered the issue have held that it should not apply to such cases. These courts have reasoned that the endorsement binds a truck lessee's insurer only in situations involving the public in order to effectuate Congress' intent to provide readily accessible compensation to vic-

tims of trucking accidents. As between insureds and insurers distributing that liability after the fact, the endorsement should have no impact. *See, e.g., Occidental Fire & Casualty Co. v. International Ins. Co.,* 804 F.2d 983, 986 (7th Cir.1986) ("[C]ases confronted with the issue of whether the ICC endorsement imposes liability on the lessee's insurance carrier have held that as long as the member of the public has been compensated for his or her loss, the ICC endorsement does not make the lessee's insurer primarily liable as a matter of law."); *Carter v. Vangilder,* 803 F.2d 189, 192 (5th Cir.1986) ("[T]he ICC endorsement does not require the reading out of the excess provisions of [an insurance] policy, leaving [the insurer] as a primary insurer."); *Carolina Casualty Ins. Co. v. Insurance Co. of N. America,* 595 F.2d 128, 138 (3d Cir.1979) ("While a lessee cannot free itself of its federally imposed duties when protection of the public is at stake, the federal requirements are not so radically intrusive as to absolve lessors or their insurers of otherwise existing obligations under applicable state tort law doctrines or under contracts allocating financial risk among private parties." (footnote omitted)). *But see, e.g., Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.,* 868 F.2d 357, 363 (10th Cir. 1989) (holding that the MCS–90 endorsement is part of the policy, and that its language nowhere indicates that it has no impact in disputes between insurers).

The Court agrees with the majority approach. Once third parties have been compensated, the ICC regulatory scheme should not pose a bar to reapportionment of loss among insureds and insurers. No important public interest would thereby be served. The Court, therefore, will consider MMI's "other insurance" clause in apportioning liability between Prestige and MMI.

### 2. Interpretation Of The "Other Insurance" Clauses In The Prestige And MMI Policies.

Reading the competing "other insurance" clauses in light of the facts of this case, the Court finds that the clauses dictate a finding that MMI and Prestige both provide for only "excess" coverage of the Wolverine and

Freed judgments. This seemingly anomalous analytical result is required for the following reasons.

■ The Prestige policy states that "[t]his policy's liability coverage is primary for any auto while hired or borrowed by [Bogle] and used exclusively in [Bogle's] business as a trucker...." The Court does not believe that this language applies to make Prestige's coverage primary because Bogle simply is not a "trucker." The Prestige policy does not define the term, but the MMI policy does. According to MMI's policy: " 'Trucker' means any person or organization engaged in the business of transporting property by auto for hire." *See* MMI Policy, CA 00 12, p. 1. This definition is consistent with the ordinary meaning of the term, and the Court accepts it for the purposes of this action. Applying that definition to the facts of the case, the record shows that Bogle was not in the business of transporting goods for hire. Rather, he was a lessor of vehicles to "truckers" like Wolverine and Frostways. Indeed, the record demonstrates that at the time of the accident, Bogle was attempting to negotiate or enter into a lease with Frostways, and not to carry loads on his own. Because Bogle is not a trucker within the meaning ascribed to that term, the primary insurance clause in paragraph one does not apply.

■ The Court, however, holds that the excess clause in paragraph one is applicable to this case. It states, again, that "[t]his policy's liability coverage is excess over any collectible insurance for any covered auto while hired or borrowed from [Bogle] by another trucker." Thus, Prestige's coverage will be excess so long as the facts support a finding that (1) the truck was covered under its policy, (2) the truck was "hired or borrowed" at the time of the accident, and (3) a "trucker" was the entity that hired or borrowed the truck.

This Court has already held that the truck was a "covered auto" under the Prestige policy. It also believes that the truck was "hired" by a "trucker" at the time of the accident. With respect to the truck's "hired" status, *Paul* held that the lease between Bogle and Wolverine was still in effect at the

time of the accident. The Court believes that this fact mandates a finding that the truck was still "hired" by Wolverine at the time of the accident for the purposes of Prestige's "other insurance" clause.

Although the Prestige policy does not define the term "hired," the MMI policy does, and that definition includes autos under lease. *See, supra,* p. 1066. This definition is in accord with the plain meaning of term. The Court will, therefore, rely upon it for purposes of interpreting Prestige's "other insurance" clause and hold that under that clause the truck driven by Freed at the time of the accident was, in fact, "hired" by Wolverine.

Finally, Wolverine clearly qualifies as a "trucker" as this Court has defined the term because it was an interstate motor carrier for hire. Prestige's coverage of the liabilities generated by the Freed–Paul accident is, then, excess because of the express terms of the excess clause in its policy's "other insurance" provision.

■ Similarly, the Court finds that MMI's coverage for the accident under the terms of its policy was also excess. Neither provision in paragraph one above applies to MMI's liability. The truck was not used exclusively in Wolverine's business at the time of the accident, so MMI's coverage is not primary. The coverage was not excess either, because Bogle—even though the facts show he did, in fact, "borrow" the truck—was not a trucker. Paragraph three, then, governs MMI's status as primary or excess carrier, and that clause states that coverage is excess for unowned autos. Under MMI's policy, the truck involved in the accident was merely "hired," not "owned." Therefore, MMI, too, provides only excess coverage for the judgments arising from the Freed–Paul collision.

### 3. *The Excess Coverage Clauses Must Be Disregarded And Liability Apportioned On A Pro Rata Basis In Accord With Policy Limits.*

■ As the Court noted earlier, the foregoing analysis creates an anomalous situation: two policies cover the Freed and Wol-

verine judgments, but each on only an excess basis, and there is no other primary insurer. This is not the first time, however, that courts have confronted these circumstances. When facing conflicting excess coverage clauses, Michigan courts have disregarded both clauses and, instead, have apportioned liability between the insurers on a *pro rata* basis; specifically, each insurer contributes a percentage of the actual loss or judgment which is equal to its percentage of the total available coverage. *See, e.g., National Indem. Co. v. Budget Rent A Car Sys., Inc.,* 195 Mich.App. 186, 489 N.W.2d 175, 177 (1992) (holding that two competing excess coverage clauses will not be given effect and liability will be apportioned according to policy limits); *Mary Free Bed Hosp. & Rehabilitation Ctr.,* 131 Mich.App. 105, 345 N.W.2d 658, 658–59 (1983) ("[W]e hold that the [excess] clauses should be disregarded and *pro rata* liability attached."), *ap. denied,* 419 Mich. 943 (1984).

In *St. Paul Fire & Marine Ins. Co. v. American Home Assurance Co.,* 444 Mich. 560, 514 N.W.2d 113, (1994), the Michigan Supreme Court held that there was no conflict between clauses establishing *pro rata* coverage liability between insurers in two legal malpractice policies issued by plaintiffs and an excess coverage clause in a third policy issued by defendant. The *St. Paul* court went on to hold that the insurance policies containing only the *pro rata* language were the primary policies; therefore, the excess carrier was absolved from liability because the primary policies had *not* yet been exhausted. 514 N.W.2d at 120–21.

Importantly for this case, the Michigan Supreme Court indicated in *St. Paul,* without deciding the issue, that the result would have been different if two competing excess coverage clauses like the ones in the instant case were involved:

> We ... acknowledge that it may be necessary to declare "other insurance" clauses irreconcilable when the applicable portions of the two "other insurance" clauses are identical excess clauses. In the example presented, there is an actual problem of circularity. Moreover, the literal interpretation of policies containing competing excess clauses would leave the insured without any coverage where it first appeared he had multiple coverage. In these cases, there is no rational reason to give the language of one policy preference over identical language in the other policy.

> However, that is not the case before us. Instead, we are confronted with a dispute involving *pro rata* and excess "other insurance" clauses.

514 N.W.2d at 121 (footnote omitted). *See also* 514 N.W.2d at 118–19 n. 24 (refusing to overturn other cases, including the ones cited above, dealing with conflicts between "other insurance" clauses).

Michigan law, therefore, dictates that this Court give no effect to the excess coverage clauses in the Prestige and MMI policies and instead apportion liability between them in accord with their policy limits. Indeed, both policies contain identical language setting forth just such an apportionment scheme:

> When two or more policies cover on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the limit of our policy bears to the total of the limits of all policies covering on the same basis.

*See* Prestige Policy, Endorsement CA 00 19; MMI Policy, Form CA 00 12, p. 6.

It is undisputed that MMI's policy provided coverage of up to $1,000,000.00 for each occurrence; Prestige provided up to $500,000.00. Therefore, under Michigan law and the provision in both policies, MMI should pay two-thirds (⅔s) of the judgments assessed against Wolverine and Freed and Prestige should pay one-third (⅓). This ruling will result in having MMI reimburse Prestige for two-thirds of the $251,428.67 that it incurred to settle the claims by Mr. and Mrs. Paul as a result of the Freed–Paul accident. That amount is $167,619.11.

## F. *OTHER ARGUMENTS MADE BY THE PARTIES ARE UNAVAILING.*

Before concluding, the Court would like to address a few other arguments made by counsel in their briefs and at oral argument. First, MMI argued that it was subrogated to the rights of Bogle for indemnification by

virtue of the MCS–90 indorsement, which permits the insurer to recover from "the insured" the amount of money it has to pay as a result of the endorsement. The Court has held that this endorsement does not apply to apportionment of the coverage liability in this case. This argument, therefore, is now moot.

MMI also argues that it is entitled to contractual subrogation to the rights of Bogle under the following clause of its policy:

> If we make any payment, we are entitled to recover what we paid from other parties. Any person to or for whom we make payment must transfer to us his or her rights of recovery against any other party. This person must do everything necessary to secure these rights and must do nothing that would jeopardize them.

*See* MMI's Policy, Form CA 00 12, p. 6. This clause does not advance MMI's fortunes. Any rights that Bogle has are against Freed and Wolverine, which this Court has held are insureds enjoying coverage under MMI's policy. Thus, MMI will still have to pay two-thirds of the judgments whether it enjoys subrogation rights or not.

Prestige has also offered two parting arguments. First, it asks this Court to apply the rule that an insurer is not subrogated to the rights of a named insured against an additional insured. *See, e.g., Carolina Cas. Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d 304, 313 (5th Cir.1978); Mark S. Rhodes, 16 *Couch on Insurance 2d* § 61:137 (1983 & Supp.1993). While application of this rule would bar MMI from pursuing Wolverine's judgment against Freed because both are insureds under its policy, it would also prohibit Prestige from going against Wolverine (and, thus, MMI) for its indemnification of Bogle, since Wolverine is an additional insured under Prestige's policy.

As set forth in 16 *Couch* § 61:18: "Stated simply, subrogation is a creature of equity having for its purpose the working out of an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who in good conscience ought to pay." The Court will, therefore, not mechanically apply the rule Prestige urges because it will cause the inequitable result of only one of the parties' being stuck with the entire coverage for the judgments.

Finally, Prestige argued that under Michigan law, Bogle was not liable for this accident under M.C.L. § 257.401(2), quoted *supra*, n. 2. The Court will save this argument for another day because Bogle's liability was never an issue in this case. Rather, this Court had to distribute the liability for the two judgments entered in *Paul.* It has done that, and will now enter judgment.

## IV.  CONCLUSION

In this case, the Court has attempted—after carefully weighing the maze of seemingly conflicting clauses in each of the policies, as well as the *Paul* rulings, and the applicable statutes, regulations, and case law—to determine the proper legal result dictated by the factual and contractual relationships between the parties and their insureds. The Court believes that the result derived from its interpretation of these legal relationships is also the fairest and most equitable distribution of coverage liability for this accident. Prestige and MMI cannot argue that they did not assume equal risk for the Freed–Paul collision. Prestige is liable essentially because Bogle and Freed were using the truck for their own benefit at the time of the accident, and Prestige's policy provided coverage for just such "bobtailing." MMI is liable largely because the *Paul* court held that MMI's named insured, Wolverine, was Freed's statutory employer and a statutory owner of the truck at the time of the accident. The factual premise for these holdings was the undisputed evidence that Wolverine permitted Bogle and Freed's use of the truck without first taking the steps necessary to terminate its lease and, thus, avoid any possible liability. In light of the facts and the assumption of risk by both insurers, it would not only be legally inappropriate for the Court to permit either insurer to escape some coverage liability for this action; it would also not be equitable.

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Prestige's motion for summary judgment is GRANTED IN PART and

DENIED IN PART. MMI is to pay to Prestige two-thirds (⅔s) of the Wolverine and Freed judgments, or $167,619.11.

IT IS FURTHER ORDERED that MMI's motion for summary judgment is DENIED.