**PRESTIGE CASUALTY COMPANY, Plaintiff–Appellee, Cross–Appellant,**

v.

**MICHIGAN MUTUAL INSURANCE COMPANY, Defendant–Appellant, Cross–Appellee.**

Nos. 95–1036, 95–1049.

United States Court of Appeals, Sixth Circuit.

Argued May 10, 1996.

Decided Nov. 4, 1996.

David S. Anderson (argued and briefed), Ward, Anderson & Porritt, Bloomfield Hills, MI, for Plaintiff–Appellee, Cross–Appellant.

Christopher L. Terry (argued and briefed), Rutledge, Manion, Rabaut, Terry & Thomas, Detroit, MI, for Defendant–Appellant, Cross–Appellee.

Before: SUHRHEINRICH and SILER, Circuit Judges, and CARR, District Judge.*

SUHRHEINRICH, Circuit Judge.

In this declaratory judgment action we consider which of two insurance companies must provide primary coverage for liability arising out of a collision of a tractor-trailer and an automobile. Defendant–Appellant–Cross–Appellee Michigan Mutual Insurance Co. ("Michigan Mutual") is the insurer of the motor carrier Wolverine Expediting, Inc. which leased the truck from George Bogle, the owner of the truck and insured of Plaintiff–Appellee–Cross–Appellant Prestige Casualty Company ("Prestige"). Central to the resolution of liabilities is the effect Interstate Commerce Commission ("ICC") regulations making the motor carrier strictly liable for

"public liability" from negligent use of the motor vehicle have on the relationship between insurers.

## I. Background

### A. Motor Carrier Industry

#### 1. ICC Regulations

It is common practice for motor carriers who operate under the authority of the ICC, i.e. "authorized carriers"[1], to lease equipment from independent contractors who are not regulated by the ICC. Historically, this practice led to abuses which threatened the economic stability of the trucking industry and public interest. *American Trucking Ass'ns v. United States*, 344 U.S. 298, 304–05, 73 S.Ct. 307, 311–12, 97 L.Ed. 337 (1953); *Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.*, 868 F.2d 357, 362 (10th Cir. 1989); 4 Saul Sorkin, *Goods in Transit*, 45.02[2] (1994). Unscrupulous ICC-licensed carriers would use leased vehicles to avoid safety regulations governing equipment and drivers. *American Trucking*, 344 U.S. at 305, 73 S.Ct. at 312. Authorized carriers' use of non-owned vehicles also caused public confusion as to who was financially responsible for the vehicles. *Empire Fire*, 868 F.2d at 362; *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 477 (3d Cir. 1961).

To right these wrongs, Congress amended the Interstate Commerce Act to allow the ICC to promulgate regulations governing all aspects of the non-owned equipment by authorized carriers. *See* 49 U.S.C. § 304(e)(1956), *revised* 49 U.S.C. § 11107 (1978); *see also* 49 U.S.C. § 10927.[2] *See generally Empire Fire*, 868 F.2d at 362, 4 Sorkin, *Goods in Transit*, § 45.03. ICC regulations now require that every lease entered into by an ICC-licensed carrier must contain a clause stating that the authorized carrier

---

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

**1.** An "authorized carrier" is "[a] person or persons authorized to engage in the transportation of property as a common or contract carrier under the provisions of 49 U.S.C. 10921, 10922, 10923, 10928, 10931, or 10932." 49 C.F.R. § 1057.2(a)(1995).

**2.** 49 U.S.C. § 11107 is now located at 49 U.S.C. § 14102 (1996); 49 U.S.C. § 10927 is now located at 49 U.S.C. § 13906 (1996). All references in this text are to the 1995 text, unless the 1995 provision differs from those in effect at the time of the accident.

maintain "exclusive possession, control, and use of the equipment for the duration of the lease," and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c)(1)(1995). Further, all authorized carriers must maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's license. 49 C.F.R. § 1043.1(a)(1995).

The regulations contain a form endorsement to be included in the authorized carrier-lessee's insurance policy (the "ICC endorsement"). *See* 49 C.F.R. § 387.15 (1995). It provides in relevant part:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured within the limits stated herein, as a motor carrier of property, with sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration's Bureau of Motor Carrier Safety (Bureau) and the Interstate Commerce Commission (ICC).
>
> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980. . . . It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condi-

tion, insolvency or bankruptcy of the insured.

## 2. Bob-tail Insurance

■ "Bob-tail" in trucking parlance is the operation of a tractor without an attached trailer. *Reeves v. B & P Motor Lines, Inc.,* 82 N.C.App. 562, 346 S.E.2d 673, 675 (1986); 4 Sorkin, *Goods in Transit,* § 45.01. For insurance purposes, however, it typically means coverage "only when the tractor is being used without a trailer or with an empty trailer, and is not being operated in the business of an authorized carrier." 4 Sorkin, *Goods in Transit,* § 45.02[2]. Bob-tail/deadhead [3] insurance is also known as "non-trucking use insurance." *Id. See also Reeves,* 346 S.E.2d at 675–76 (interpreting endorsement denominated as "Truckmen—Insurance for Non–Trucking Use (Bob-tail only)" defined as used in business of any person to whom rented and excluding coverage whenever lessor is "in the business of the lessee"). Owner-operators who lease trucks, tractors and trailers with drivers to authorized carriers frequently carry limited liability or "bob-tail/deadhead" insurance. 4 Sorkin, *Goods in Transit* § 45.02[2].

## B. Facts

The facts are undisputed. George Bogle, a lessor of trucks, leased one of his vehicles to Wolverine Expediting, Inc. on June 11, 1985. Wolverine is a licensed interstate transportation company. In accordance with ICC regulations, the lease provided that Wolverine was granted exclusive possession, use and control of the truck for use in Wolverine's trucking business for not less than thirty days, and that Wolverine would be liable for all claims for damages arising out of operation of the vehicle during the lease period.

Bogle subsequently hired driver Gregory C. Freed to drive the truck. Bogle paid Freed a percentage of monies made on each trip. On October 8, 1985, while driving the truck east on I–96 in Wayne County, Michigan, Freed struck Ronald Paul's vehicle. Paul was seriously injured as a result.

---

**3.** "Deadheading" is "the operation of a tractor-trailer or a truck where the trailer or truck is empty and contains no cargo; a vehicle without a load." 4 Saul E. Sorkin, *Goods in Transit,* § 45.01[1](1994).

Just prior to the accident, Bogle had "borrowed back" the truck from Wolverine because Wolverine's business was slow. Wolverine failed, however, to remove its identifying placards from the truck and to request a receipt for surrender of the vehicle as required by ICC regulations. *See* 49 C.F.R. §§ 1057.11(b); 1057.12(b). *See also, Rodriguez v. Ager,* 705 F.2d 1229, 1236 (10th Cir.1983).

### C. State Court Proceedings

Paul and his wife brought suit in state court on July 18, 1986, against Bogle, Freed, and Wolverine. After plaintiffs stipulated to the dismissal of Wolverine, Bogle and Freed filed a third-party complaint against the motor carrier/lessee, asserting that Wolverine was primarily liable for Paul's damages pursuant to the applicable ICC regulations. Wolverine counterclaimed that it was entitled to indemnification from Freed for any monies it might owe Bogle.

On motions for summary disposition, the state trial court ruled that the ICC regulations imposed primary liability on Wolverine. The court rejected Wolverine's claim for indemnification from Freed, concluding that Freed was a "statutory employee" of Wolverine. The parties appealed.

Bogle and Freed settled with Paul for $225,000 during the pendency of the appeal. The sum was paid by Bogle's insurer, Prestige Casualty Company.

The Michigan Court of Appeals affirmed in part and reversed in part. *Paul v. Bogle,* 193 Mich.App. 479, 484 N.W.2d 728 (1992). First, the court ruled that Wolverine was liable for the accident because Freed was Wolverine's "statutory employee" under the ICC regulations and applicable state law. *Id.* 484 N.W.2d at 733.

The *Paul* court then determined that Wolverine was liable under state law as an owner of the vehicle because the Michigan Vehicle Code, which defines an owner of a motor vehicle to include anyone who leases a vehicle for more than thirty days. *Id.* Additionally, the court found that Wolverine's failure to remove its identifying placards and to request in accordance with ICC regulations a

receipt for surrender constituted its implied consent to Bogle and Freed to use the truck for any purpose. *Id.* at 733–34. In so ruling the court specifically rejected Wolverine's argument that it should not have any liability because Freed was driving the truck on Bogle's business at the time of the accident:

> The applicable statute, when taken into consideration with Wolverine's duties under the applicable ICC regulations, precludes the success of such an argument. Under the ICC regulations, Wolverine continued to consent to the use of the vehicle, no matter whose business or interests were pursued, as long as the identifying placards remained on the vehicle and Wolverine had not obtained a receipt from Bogle or his agent for the return of the vehicle. Given this implied consent, it is immaterial whose business was being pursued at the time of the accident.

*Id.* at 734.

The *Paul* court then turned to Freed and Bogle's request for indemnification from Wolverine. The appellate court reversed the trial court's order granting Freed contractual indemnification from Wolverine because Freed was not a third-party beneficiary of the lease. The court held that Bogle, as a signatory to the lease agreement prepared in accordance with the ICC regulations, was entitled to contractual indemnification from Wolverine pursuant to the indemnity clause in the lease. Finally, the appeals court stated that Wolverine might be entitled to common-law indemnification from Freed for any amount it owed Bogle, also reversing the trial court on this point.

On remand the state trial court entered a judgment for contractual indemnification in favor of Bogle against Wolverine for $251,-428.67. Said sum represented the $225,000 settlement paid to Mr. and Mrs. Paul, plus attorneys fees. The court also ordered Freed to pay Wolverine the same sum based upon common-law indemnification. Freed appealed this decision. The Michigan Court of Appeals affirmed the judgment. The Michigan Supreme Court denied leave to appeal.

## D. District Court's Decision

Prestige filed this declaratory judgment action against Michigan Mutual in federal district court on April 8, 1993. Prestige sought a determination that Michigan Mutual's policy provides primary coverage for payment of Bogle's judgment against Wolverine and Wolverine's judgment against Freed. Both parties filed cross motions for summary judgment. The district court held that Wolverine and Freed are insureds under both insurance policies, and that both policies provide excess coverage for payment of the indemnification judgments. *Prestige Cas. Co. v. Michigan Mut. Ins. Co.,* 859 F.Supp. 1058 (E.D.Mich.1994). The court found as a preliminary matter that the truck Freed was driving at the time of the accident was a "covered auto" under both policies.

> MMI's policy provided liability insurance for the truck as a "hired" auto, which was defined as "those autos you [Wolverine] lease, hire, rent, or borrow." *See* MMI Policy, Declaration Page, Form CA 00 02. The Prestige policy, for its part, specifically listed the truck driven by Freed as one of Bogle's "covered autos." *See* Prestige Policy, p. 1.

*Prestige,* 859 F.Supp. at 1066.

The court also found that Freed and Wolverine are insureds under both the Prestige and Michigan Mutual policies.

> First, with respect to Freed, the Court finds that he is an additional insured under both the Prestige and MMI policies by virtue of the following language contained in both policies: "Anyone else is an insured while using with your permission a covered auto you own, hire or borrow . . ." *See* MMI Policy, Form CA 00 12, p. 2; Prestige Policy, CA 00 19.
>
> . . . . .
>
> [I]t cannot be disputed that Freed was using, i.e., operating, a covered auto owned by Bogle and hired by Wolverine with their permission at the time of the accident. Thus, under the plain terms of both policies, Freed is an insured under these policies.

*Id.* at 1066–67. As for Wolverine,

> [A]s named insured under the MMI policy, Wolverine is, of course, covered by that

policy. The Court also believes that Wolverine is an insured under the Prestige policy because of the following language: "Anyone liable for the conduct of an insured described above is insured but only to the extent of that liability." *See* Prestige Policy, CA 00 19.
>
> Prestige argues that this clause does not apply because Wolverine's liability to Bogle arises strictly from its lease with Bogle and not from its relationship to Freed.... However, it is undisputed that any liability Wolverine may have springs from Freed's conduct. Thus, the Court believes that the above clause applies to include Wolverine among the additional insureds under the Prestige policy.

*Id.* at 1067.

Next, the district court determined that the broad coverage clauses in both policies provided coverage for the Wolverine and Freed judgments.

Prestige's clause states:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance, or use . . . of an owned automobile....

*See* Prestige Policy, Declarations, p. 1. The MMI policy, for its part, states:

> We will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.

*See* MMI Policy, Form CA 00 12, p. 2.

On their face, these clauses provide coverage to Wolverine and Freed for the accident. The truck which was involved in the accident was a covered auto under both policies, and was in use with Wolverine and Bogle's permission at the time of the accident. Thus, unless the parties can point to specific exclusions in their policies, they

both must provide coverage for the liabilities generated by the Freed–Paul collision.

*Id.* at 1067–68.

The district court rejected Prestige's argument that a clause in Endorsement CA 23 10, which provides that "[l]iability insurance does not apply while the covered auto is used in the business of anyone to whom it is leased or rented if the lessee has liability insurance sufficient to pay for damages," excluded coverage for this accident because Wolverine had leased the truck and had enough insurance to cover the injuries caused by the Freed–Paul accident. The court remarked that:

> Prestige's argument goes too far too quickly. The "used in the business" endorsement states that trucks used in the business of lessees with enough insurance are exempted. If Freed had been driving or seeking a load for Wolverine at the time of the accident, there is no question that Prestige's policy would not apply. The undisputed facts of this case, however, indicate that Freed, while acting with the permission of Wolverine, was seeking a load to benefit himself and Bogle. In light of this fact and the plain meaning of the endorsement, the Court cannot find that it excludes Wolverine from coverage under Prestige's policy.

*Id.* at 1068. The court found further support for its holding in Bogle's own understanding of the Prestige policy, which he purchased for times when the vehicle was "bobtailing." Moreover, Endorsements to the Prestige policy adding and deleting vehicles from coverage contained a line which reads: "ADDED/DELETED BOBTAIL LIABILITY LIMITS AND PHYSICAL DAMAGE DEDUCTIBLES." *Id.* at 1069 (quoting Prestige Policy, Coverage Endorsements).

The court also rejected both parties' arguments that exclusions for "liability assumed [by the insured] under any contract or agreement" exonerated them both from coverage of Bogle's judgment against Wolverine. The district court reasoned that:

> Although the state appellate and trial courts in *Paul* did apparently rely upon a contractual indemnification theory springing from the Bogle–Wolverine lease as the grounds for the judgment against Wolverine, their decisions were, in the Court's opinion, inextricably linked to the appellate court's analysis of Wolverine's liability for the accident as Freed's statutory employer as a statutory "owner" of the vehicle. If Wolverine's liability were purely contractual, the *Paul* appellate court simply would not have had to engage in the extensive statutory employee and statutory owner analysis that makes up a large portion of that opinion.

*Id.* at 1070.

This left the ultimate issue in the case: the effect of the identical "other insurance" clauses found in both policies.[4] As a preliminary matter, the court rejected Prestige's argument that an ICC-mandated endorsement, known as MCS–90, vitiated Michigan Mutual's "other insurance" clause. The endorsement provides that nothing in the insurance contract "shall relieve the company from liability or from the payment of any final judgment." Noting a split of authority, the district court adopted the view of some courts that the endorsement binds a truck lessee's insurer only in situations involving the public and has no impact as between insureds and insurers distributing that liability after the fact. *Id.* at 1071 (citations omitted).

This left the interpretation of the "other insurance" clauses in both policies. The

---

4. They provide:
 1. This policy's liability coverage is primary for any covered auto while hired or borrowed by you and used exclusively in your business as a trucker and pursuant to operating rights granted to you by a public authority. This policy's liability coverage is excess over any collectible insurance for any covered auto while hired or borrowed from you by another trucker.
 2. [Not applicable.]
 3. Except as provided in Paragraphs 1 and 2 above, the policy provides primary insurance for any covered auto you own and excess insurance for any auto you don't own.
 
 *Prestige,* 859 F.Supp. at 1070–71 (citations and footnote omitted).

court came up with the "seemingly anomalous analytical result" that both policies were "excess." *Id.* at 1071–72. It reasoned that:

> The Prestige policy states that "[t]his policy's liability coverage is primary for any auto while hired or borrowed by [Bogle] and used exclusively in [Bogle's] business as a trucker...." The Court does not believe that this language applies to make Prestige's coverage primary because Bogle simply is not a "trucker." The Prestige policy does not define the term, but the MMI policy does. According to MMI's policy: "'Trucker' means any person or organization engaged in the business of transporting property by auto for hire." *See* MMI Policy, CA 00 12, p. 1. This definition is consistent with the ordinary meaning of the term, and the Court accepts it for the purposes of this action. Applying that definition to the facts of the case, the record shows that Bogle was not in the business of transporting goods for hire. Rather, he was a lessor of·vehicles to "truckers" like Wolverine and Frostways. Indeed, the record demonstrates that at the time of the accident, Bogle was attempting to negotiate or enter into a lease with Frostways, and not to carry loads on his own. Because Bogle is not a trucker within the meaning ascribed to that term, the primary insurance clause in paragraph one does not apply.

*Id.* at 1072. However, the court held that the excess clause in paragraph one, which provides that "[t]his policy's liability coverage is excess over any collectible insurance for any covered auto while hired or borrowed from [Bogle] by another trucker" was applicable. *Id.* The court found that the truck was a "covered ·auto" under the Prestige policy, that it was "hired" by a "trucker" at the time of the accident because the lease between Bogle and Wolverine was still in effect at the time of the accident, and that Wolverine clearly qualified as a "trucker"

because it was an interstate motor carrier for hire. *Id.*

Similarly, the district court concluded that Michigan Mutual's coverage for the accident under the policy was also excess. Neither provision in paragraph one of the other insurance provision applied to Michigan Mutual's liability. The first sentence did not apply because the truck was not used exclusively in Wolverine's business at the time of the accident. The second did not apply either because Bogle, though he did in fact "borrow" the truck, was not a trucker. Thus, Michigan Mutual's status as primary or excess carrier was governed by paragraph three. Under that paragraph, the truck was merely "hired," not "owned," and therefore the policy provided excess coverage only. *Id.*

Given this outcome, the court disregarded the excess coverage clauses and apportioned liability on a pro rata basis in accordance with Michigan law. The Michigan Mutual policy provides $1,000,000 of liability coverage, and Prestige has a liability coverage cap of $500,000. The court held that Michigan Mutual was liable for two-thirds of the judgment, or $167,619.11. *Id.* at 1073. Upon motion for reconsideration, the district court reduced Prestige's judgment against Michigan Mutual by $1,208.20, which represented one-third of the fees and costs that defendant incurred in defending Wolverine from the state negligence claim.

In this appeal and cross-appeal, Michigan Mutual argues that the Prestige policy affords primary liability coverage to Wolverine, Bogle and Freed, and the Michigan Mutual policy affords excess coverage. Alternatively Michigan Mutual claims it is entitled to indemnification from Prestige, as Freed's liability insurer, for any sum Michigan Mutual may be required to pay Bogle.[5] Prestige, for its part, urges this court to hold that Michigan Mutual's policy is primary as a matter of law because of the ICC endorsement. Further, Prestige asks us to conclude that as its

---

5. Michigan Mutual also argued that in the event that Wolverine's liability to Bogle is not vicarious to that of Freed, but is predicated entirely upon express contractual indemnification, Exclusion C.1 in the Michigan Mutual policy is controlling, and no one is covered. Michigan Mutual

dropped this argument after the Michigan Court of Appeals affirmed the state court's ruling upon remand that Wolverine was also entitled to contractual indemnification from Freed and the Michigan·Supreme Court denied leave to appeal.

policy provides excess coverage, Michigan Mutual is not entitled to subrogation.

## II.

■ We review de novo the district court's grant of summary judgment. *Johnson v. United States Postal Serv.*, 64 F.3d 233, 236 (6th Cir.1995). Summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Johnson*, 64 F.3d at 236.

■ In diversity cases, this court applies state law in accordance with the controlling decisions of the Michigan Supreme Court. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Bailey Farms, Inc. v. NOR–AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir.1994). If the state supreme court has not yet addressed the issue presented, we must predict how that court would rule, by looking to "all available data." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995). "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Id.*

### A.

As the district court recognized, the essence of this case is the effect of the identical "other insurance" provisions. Integral to this analysis is the question of what effect the ICC endorsement has upon the determination of which insurer bears the ultimate burden of loss. Accordingly, we begin here.

### 1.

■ Because Wolverine is an interstate carrier operating pursuant to an ICC certificate and authority, the ICC endorsement is attached [6] to Michigan Mutual's policy. *See* 49 C.F.R. § 387.15 (1995). *See also* 49 C.F.R. § 1043.1(a)(1995). There are three basic views on how this endorsement affects

the allocation of risk between insurers: (1) the ICC endorsement makes the insurance policy to which it is attached primary as a matter of law over all other insurance policies that lack similar provisions, *see, e.g., Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.*, 930 F.2d 258 (2d Cir.1991); (2) the ICC endorsement only negates limiting provisions in the policy to which it is attached, but does not establish primary liability over other policies that are also primary by their own terms, *see, e.g., Empire Fire*, 868 F.2d at 361–62; *American Gen. Fire & Cas. Co. v. Truck Ins. Exchange*, 660 F.Supp. 557 (D.Kan.1987); *Transport Indem. Co. v. Carolina Cas. Ins. Co.*, 133 Ariz. 395, 652 P.2d 134 (1982); *Zurich–American Ins. Co. v. Amerisure Ins. Co.*, 215 Mich.App. 526, 547 N.W.2d 52 (1996); and (3) the ICC endorsement applies only to situations in which a claim is being asserted by a shipper or member of the public, and has no application as among insurers. *See, e.g., Occidental Fire & Casualty Co. v. Int'l Ins. Co.*, 804 F.2d 983, 986 (7th Cir.1986); *Carter v. Vangilder*, 803 F.2d 189, 192 (5th Cir.1986); *Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir.1986); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.*, 722 F.2d 1400 (8th Cir.1983); *Transport Indem. Co. v. Paxton Nat'l Ins. Co.*, 657 F.2d 657 (5th Cir.1981)(Unit A); *Carolina Casualty Ins. Co. v. Ins. Co. of North America*, 595 F.2d 128, 138 (3rd Cir.1979); *Truck Ins. Exchange v. Transport Indem. Co.*, 180 Mont. 419, 591 P.2d 188 (1979). The district court adopted the third view.

Although the Michigan Supreme Court has not spoken on the subject, *Zurich*, a recent decision from the Michigan Court of Appeals, is directly on point. Rejecting the third approach, the *Zurich* court relied on *American Gen.:*

> As the court explained in *American General Fire & Casualty Co. v. Truck Ins. Exchange*, 660 F.Supp. 557, 566 (D.Kan. 1987):

> *port Insur. Co.*, 787 F.2d 1133, 1139 (7th Cir. 1986); *Hagans v. Glens Falls Insur. Co.*, 465 F.2d 1249, 1252 (10th Cir.1972).

---

**6.** Although the ICC endorsement in fact is not attached to Michigan Mutual's policy, Michigan Mutual acknowledges that it is incorporated as a matter of law. *See Travelers Insur. Co. v. Trans-*

The fact that public policy issues are not involved when an insurance company is suing the carrier's insurer does not give a court leave to ignore the actual terms of the policy. The Arizona Supreme Court addressed this flaw in *Transport Indemnity Co. v. Carolina Casualty Ins. Co.,* 133 Ariz. 395, 403, 652 P.2d 134, 142 (1982):

> "Even if we were to hold that federal law does not alone determine the rights of the insurers, we cannot read out of the Transport policy a provision which is in that policy. The fact that federal law imputes that provision when the policy is certified does not allow us to conclude that it is written in special ink which appears for cases involving the public and disappears in cases involving other insurers. Here the clause is physically attached to the policy and must be given effect."

*Zurich,* 547 N.W.2d at 58.

Instead, the *Zurich* court adopted the second approach for the reasons stated in *Empire Fire:*

> Nothing in the language of this endorsement purports to make the insurance policy to which it is attached primary over all other primary insurance policies. A straightforward reading of the language suggests only that it negates any clauses in the body of the policy to which it is attached that would have the effect of limiting that insurance carrier's liability. That is, it deletes limiting clauses in the policy to which it is attached, but it does not create new, additional obligations in the policy, nor does it purport to limit or delete clauses in other policies issued by other insurance companies that may also have contractually assumed primary liability for the risk involved.
> * * * The ICC endorsement cannot, however, nullify the effect of other policies that are also primary by their own terms. To hold otherwise would grant the insurers who issued those policies a windfall. We find no authority to suggest that the ICC intended to allow other insurance companies to escape their contractual obligations to provide additional primary coverage, for

which they presumably collected premiums, merely because of the fortuity that another policy involved in the matter contains an ICC endorsement.

*Id.* (quoting *Empire Fire,* 868 F.2d at 363).

We find this reasoning persuasive and hold that the Michigan Supreme Court would so hold. *Cf. Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975)(holding that neither federal statutes nor regulations prohibited owner-lessor and carrier-lessee from allocating ultimate liability through indemnification provision in equipment lease so long as lessee does not absolve itself from duties to the public and shippers imposed upon it by the regulations).

Having established that Michigan Mutual is the primary insurer as a matter of law, Michigan Mutual will be liable for the full amount by the terms of the policy unless we determine that Prestige's policy is also primary.

**2.**

■ The district court concluded that Prestige's policy was "excess" because Bogle was not a "trucker" within the meaning of the Prestige policy. The Prestige provision states:

> B.1. This policy's liability coverage is primary for any covered **auto** while hired or borrowed by you and used exclusively in your business as a **trucker** and pursuant to operating rights granted to **you** by a public authority. This policy's liability coverage is excess over any other collectible insurance for any covered **auto** while hired or borrowed from you by another **trucker.**
>
> . . . .
>
> 3. Except as provided in Paragraphs 1 and 2 above, this policy provides primary insurance for any covered **auto you** own and excess insurance for any covered **auto you** don't own.

As noted, the district court borrowed the definition of "trucker" found in Michigan Mutual's policy, and because Bogle clearly does not satisfy that definition, concluded that the first sentence of B.1. did not apply.

Michigan Mutual contends that in borrowing Michigan Mutual's definition of "trucker" the district court ignored numerous provisions that refer to Bogle as a "trucker," and which contemplated primary coverage in situations where leased tractors were subjected to ("Non–Trucking") use. In other words, the gist of Michigan Mutual's position is that Prestige issued a "bobtail policy" for the specific purpose of affording liability coverage to Bogle and his permittees, whenever the insured vehicles were not being used in the business of persons or organizations to whom the insured vehicles were leased or rented.

 To resolve this question, we look to traditional state insurance and contract law. In Michigan, an insurance policy is just like any other contract—it is an agreement between the parties "in which a court will determine what the agreement was and effectuate the intent of the parties." *Auto–Owners Ins. Co. v. Churchman,* 440 Mich. 560, 489 N.W.2d 431, 433–34 (1992). *See generally Comerica Bank v. Lexington Ins. Co.,* 3 F.3d 939, 942 (6th Cir.1993)(noting that under Michigan law, general rules of contract construction are same as any other contract). The court looks to the contract as a whole and gives meaning to all the terms if they serve a reasonable purpose. *Harrow Products, Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1024–25 (6th Cir.1995); *Churchman,* 489 N.W.2d at 433; *Fresard v. Michigan Millers Mut. Ins. Co.,* 414 Mich. 686, 327 N.W.2d 286, 289 (1982). The intent of the parties is to be gathered from the four corners of the instrument. *Rogers v. Great Northern Life Ins. Co.,* 284 Mich. 660, 279 N.W. 906, 908 (1938). Terms in the policy must be given their plain meaning; a court cannot create an ambiguity where none exists. *Heniser v. Frankenmuth Mut. Ins. Co.,* 449 Mich. 155, 534 N.W.2d 502, 505 (1995).

 If the insurance policy fails to define a term, the court must interpret it according to its commonly used meaning, taking into account the reasonable expectations of the parties. *Anderson Development Co. v. Travelers Indemnity Co.,* 49 F.3d 1128, 1131 (6th Cir.1995); *Arco Industries Corp. v. American Motorists Insur. Co.,* 448 Mich.

395, 531 N.W.2d 168, 172 (1995). That is, the policy language in insurance contracts is to be accorded its commonly used meaning unless it is apparent from reading the instrument as a whole that a different or special meaning was intended. *Comerica Bank,* 3 F.3d at 942. A technical construction of policy language which defeats a reasonable expectation of coverage is disfavored. *State Farm Mut. Auto. Ins. Co. v. Ruuska,* 90 Mich.App. 767, 282 N.W.2d 472 (1979), *aff'd,* 412 Mich. 321, 314 N.W.2d 184 (1982).

The basic insuring provision in the Prestige agreement provides that "[t]he Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay ... for the purposes stated as applicable thereto in the declarations, of an owned automobile...." The Declarations state that the "Purpose of Use" as "Commercial" for the two listed automobiles (including the vehicle involved in the *Paul* accident). "Commercial" is defined as "use principally in the business occupation of the named insured as stated in the declarations including occasional use for personal, pleasure, family and other business purposes." Item 6 of the Prestige Declarations specifically states that "Business of the named Insured is Truckman."

"Truckman" as defined in Webster's Third New International Dictionary is "one who conveys goods by truck: a truck driver." Webster's Third New International Dictionary 2454 (1986). Bogle as an owner-lessor of trucks was obviously not a "trucker" in the commonly understood sense of the term, *see* Webster's Third New International Dictionary 2454 (1986)(defining "trucker" as "one who conveys goods by truck: a truck driver: TRUCKER"), as was Wolverine. Yet consistently throughout the policy, Bogle's business is characterized as that of a "trucker."

However, endorsement CA 00 19 of the Prestige policy, entitled "Changes in Truckers Policy," clearly reflects the parties understanding that Bogle was deemed a "trucker" for purposes of the Prestige insurance policy. For example, Paragraph B, which modifies the definition of "Insured" to include a "covered auto" which is "not connected" to a trailer which "is being used exclusively in

your business as a trucker...." This endorsement also identifies certain persons who do not qualify as insureds, including "Any trucker ... other than you or your employees." *See also* Endorsement CA 23 11 (entitled "Truckers—Michigan Amendatory Endorsement," provides that a "covered auto" also includes an auto "being used exclusively in **your** business as a **trucker**," and excludes coverage to a covered auto "hired or borrowed from **you** by any **trucker** if the **trucker** has Michigan Personal Injury and Property Protection coverage on the **auto**").

Endorsement 23 10, entitled "TRUCKERS INSURANCE FOR NON–TRUCKING USE" provides that liability insurance "does not apply while the covered **auto** is used in the business of anyone to whom it is leased or rented if the lessee has liability insurance sufficient to pay for damages in accordance with Chapter 31 of the Michigan Code." The import of this endorsement is that Prestige undertook to afford liability coverage to "TRUCKERS," but only for "NON–TRUCKING USE," which Prestige chose to define in negative terms as any use other than "use in the business of" insured lessees *while the vehicle is still under lease.* Further support for this interpretation can be found in the several endorsements adding and deleting vehicles, which refer to "BOBTAIL LIABILITY LIMITS" or "BOBTAIL/DEADHEAD LIABILITY LIMITS." Endorsement 23 10 clearly covers the instant situation, since the accident indisputedly occurred while still under lease to Wolverine but not "in the business of" Wolverine.

■ All this leads to the conclusion that the Prestige policy, as modified by Endorsement CA 23 10, applies when the truck is being used in Bogles's business, and whenever a lessee or renter from Bogle is not using the tractor exclusively in its business as a trucker. This is the classic definition of a bob-tail/deadhead policy. *See* 4 Sorkin, § 45.01[1]; *Wenkosky v. Protective Ins. Co.*, 698 F.Supp. 1227, 1228 (M.D.Pa.1988). Moreover, as the district court noted, this is what Bogle thought he was paying premiums for.

Construing the Prestige policy as a whole, and giving meaning to all terms, it is apparent that Bogle was purchasing insurance on the vehicles used in his business as a lessor of trucks (and not as an ICC-licensed common carrier) during bob-tailing/deadheading periods. Thus, although it used the common definition of the term, the district court erred in borrowing the definition of "trucker" from Michigan Mutual's policy because it is apparent that the parties had ascribed a different meaning to it.

This brings us back to the "Other Insurance" clause, also found in CA OO 19, and therefore modified by, that endorsement. As the lower court correctly noted, at the time of the accident, Bogle was attempting to negotiate or enter into a lease with Frostways, i.e, he was acting in his own business as a "trucker" as that term is understood within the four corners of the Prestige policy. The district court erred in holding the first sentence of paragraph B.1 inapplicable because Bogle was not a "trucker" as defined under Michigan Mutual's policy.

■ Prestige argues that the first sentence of paragraph B.1 cannot apply because Bogle, as "owner" of the vehicle, could not have "hired" or "borrowed" it. However, Wolverine was technically the "owner" of the truck at the time of the accident under state law as found by the Michigan Court of Appeals, *see Bogle*, 484 N.W.2d at 733 (noting that under Michigan Vehicle Code, an owner is anyone who leases a vehicle for more than thirty days) and most certainly in legal possession. Moreover, at the time of the accident, Bogle did not have control of the tractor because the lease was still in effect. Thus, to gain possession of it, Bogle in essence "borrowed" the tractor from Wolverine.

■ Next, Prestige posits that the first sentence cannot apply because Bogle was not operating "pursuant to operating rights granted to you by a public authority." It is true that Bogle, because he is not a licensed motor carrier, does not need certification from the ICC. However, the phrase "public authority" is not limited to the ICC, thus, it can just as easily be construed to mean a license from any public authority, such as a driver's license or trucker's license. In sum,

we hold that Prestige's policy is also primary under the first sentence of paragraph B.1.

### B.

Michigan Mutual argues that Prestige, as insurer of Freed, is liable under the ICC endorsement which provides that "the insured agrees to reimburse the company ... for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." Under the district court's conclusion that the ICC endorsement had no effect in the present suit, this argument was moot. However, because we conclude that Michigan Mutual's policy is primary by virtue of the ICC endorsement, we must also consider this argument. Notwithstanding, the general rule is that an insurer may not bring a subrogation action against its own insured. *See e.g., Paxton*, 657 F.2d at 660; *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 314 (5th Cir.1978). As the district court held, Freed is an additional insured under the omnibus (permissive user) clause in the Michigan Mutual policy. Michigan Mutual also argues that it is subrogated to the rights of Bogle and Freed under the following language:

### C. Our Rights to Recover From Others

If we make any payment, we are entitled to recover what we paid from other parties. Any person to or for whom we make payment must transfer to us his or her rights of recovery against any other party. This person must do everything necessary to secure these rights and must do nothing that would jeopardize them.

However, as Prestige points out, the right to subrogate arises by contract, and since Bogle is not a party to Michigan Mutual's insurance contract, Michigan Mutual cannot impose the subrogation provisions in their policy against him. Bogle would be an insured under the Michigan Mutual policy if his truck were being used exclusively in the business of Wolverine under the "Who is Insured" provision of Michigan Mutual's policy. But if this is the case, then the Prestige policy excludes coverage under endorsement CA 23 10. This argument is unavailing.

### III.

In sum, we hold that both policies are primary. We therefore **REVERSE** the judgment of the district court. However, as the district court correctly held, both policies contain identical apportionment schemes, *see Prestige*, 859 F.Supp. at 1073, and liability therefore must be apportioned on a pro rata basis. *See, e.g., Zurich*, 547 N.W.2d at 59. Thus, the district court's ultimate allocation of liabilities remains the same. On **RE-MAND** the district court is instructed to enter judgment requiring Michigan Mutual to pay two-thirds of the judgment the legal reasons stated herein, reduced by one-third of the fees and costs Michigan Mutual incurred in defending Wolverine in the state action.