**GUARDIAN ALARM COMPANY OF MICHIGAN, doing business as Guardian Security Services, Plaintiff–Appellant,**

v.

**Richard T. MAY; Bernard Schoch; David J. Marcus; Micronetics Design Corporation, Defendants–Appellees.**

No. 00–1489.

United States Court of Appeals, Sixth Circuit.

Dec. 11, 2001.

Before BATCHELDER and COLE, Circuit Judges; BECKWITH,* District Judge.

## OPINION

COLE, Circuit Judge.

Plaintiff-appellant Guardian Alarm Company of Michigan appeals the district court's decision granting summary judgment to defendants-appellees Richard T. May, Bernard Schoch. David J. Marcus, and Micronetics Design Corporation. For

---

* The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

the reasons set forth below, we AFFIRM the judgment of the district court.

## I. BACKGROUND

This diversity action arises out of a contract dispute between plaintiff-appellant Guardian Alarm Company of Michigan ("Guardian") and defendants-appellees Micronetics Design Corporation and its principals Richard T. May, Bernard Schoch, and David J. Marcus (collectively "Micronetics"). Guardian, a Michigan-based security and alarm company, and Micronetics, a Maryland-based software development company, entered into a Software Assignment, Licensing and Support Agreement ("Contract") on August 12, 1993, the purpose of which was to govern the parties use, development, and marketing of a software program called "Genesis." Micronetics had developed a software program that enabled computerized monitoring of alarm signals sent from individual customer sites to an alarm company's central station. Guardian had developed software that enabled computerized management of an alarm company's accounting and administrative functions, such as payroll, order entry, sales, accounts payable, accounts receivable, and inventory. By entering into the Contract, the parties intended to combine Micronetics' "central station" package with Guardian's accounting package to create a single integrated system known as Genesis. Guardian planned to use Genesis for its alarm business, and the parties also intended to market Genesis to other alarm companies.

Under the Contract, Guardian assigned all of its rights, title, and interest in Genesis to Micronetics for the consideration of one dollar, *see* Contract § 2.1, and Micronetics granted Guardian a license to use Genesis at no cost, subject to Micronetics' standard licensing agreement, *see* Contract § 4. Micronetics further agreed to provide support to Guardian for its use of Micronetics' central station package. *See* Contract § 5.1. However, the Contract expressly limited Micronetics' support obligation to problems that Guardian could reproduce in the "latest object code version" of Genesis, unmodified by Guardian.[1] *See id.* In the event that Guardian modified Genesis, then Micronetics was required to use only "reasonable effort" to provide support for the modified version of its software. *See id.* The Contract expressly stated that Micronetics did not "guaranty their ability to support Guardian's modified Central Station package." *Id.*

The contract further stated that Micronetics' obligation to provide support would terminate immediately if Guardian violated certain conditions relating to use of the "source code" version of Genesis. *See* Contract § 5.3. One of these conditions was that Guardian "shall use the object code only version of the Central Station Automation package supplied by [Micronetics] at any Guardian production site, except as expressly permitted under Section 6." Contract § 5.3(i). Section 6 required Micronetics to provide Guardian a copy of the source code version of Genesis, provided that "Guardian shall strictly limit use of and access to the source code ... of the Central Station Automation package to its Detroit central station." Contract § 6.1(i). Moreover, section 6 stated that Micronetics would give Guardian a copy of the source code solely to allow Guardian to

---

1. The "object code" version is the standard license copy of any software. For example, a copy of the Microsoft Windows software on sale at any software store is the "object code" version. By comparison, the "source code" version is the underlying computer program that permits the user to modify the software itself. JA at 9.

provide its own internal support for Genesis should it find the support provided by Micronetics insufficient. *See* Contract § 6.2.

In sum, therefore, Micronetics' obligation to provide support to Guardian was limited to problems that Guardian could reproduce on the "latest object code version" of Genesis, unmodified by Guardian. In the event that Guardian modified Genesis, then Micronetics was obligated only to use reasonable effort to support Guardian's modified version. Moreover, Micronetics' obligation to provide support to Guardian terminated altogether if Guardian used the source code version of Genesis except as provided under section 6 of the Contract, *i.e.*, at Guardian's Detroit central station for internal support purposes only.

Guardian filed the instant contract action in Michigan state court on September 9, 1999, alleging that Micronetics breached its contractual obligation to provide support services for Genesis.[2] Micronetics removed the case to the United States District Court for the Eastern District of Michigan on October 14, 1999, and filed a motion to dismiss or, alternatively, for summary judgment on November 29, 1999. The district court conducted a hearing on Micronetics' motion on March 22, 2000. On April 4, 2000, the court entered an order granting summary judgment in favor of Micronetics and dismissed the case. Guardian now appeals, raising the same claims it raised before the district court.

## II. DISCUSSION

### A. Standard of Review

We review *de novo* the district court's grant of summary judgment. *See Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir.1996). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central inquiry is whether the evidence presents sufficient disagreement to require submission of the case to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant has the initial burden of showing the "absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. To demonstrate a genuine issue, the non-

---

2. Guardian also alleged that Micronetics violated a 1996 state court order issued upon Guardian's motion for a preliminary injunction. *See Guardian Alarm Co. of Mich. v. May, et al.*, Case No. 96–525337–CK (Mich. Cir. Ct. (Oakland County) Aug. 21, 1996) (unpublished), *modifying Guardian Alarm Co. of Mich. v. May, et al.*, Case No. 96–525337–CK (Mich. Cir. Ct. (Oakland County) July 19, 1996) (granting preliminary injunction) (unpublished). As the district court observed, that order required Micronetics to provide support "in accordance with the parties' existing contract;" it did not amend or modify Micronetics' contractual obligations. Thus, the complaint in this case states only a claim for breach of contract.

movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a mere "scintilla of evidence" is insufficient. *Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505.

In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. *See Prestige Cas. Co.*, 99 F.3d at 1348 (applying Michigan law). If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995).

### B. The District Court Properly Granted Summary Judgment

■ The district court found that Micronetics was not obligated to provide support services to Guardian under the Contract because Guardian failed to comply with the Contract's express conditions limiting Guardian's use of the source code version of the software. In reaching this conclusion, the district court relied on the deposition testimony of Harry Hayden, Guardian's Manager of Information Systems. Hayden testified that from the inception of the Contract, Guardian always ran the source code version at its locations in Detroit, Toledo, and Cleveland; it never ran the object code version. In light of this testimony, the district court stated:

[S]ection 5.3 expressly provides that Micronetics [sic] obligation to provide support is immediately terminated if Guardian runs the source code version. The only exception to this is that Guardian was permitted to run the source code version in Detroit, Contract § 6.1(i), and that Guardian was permitted to use the source code for the purpose of providing its own support, Contract § 6.2. Because, from the inception of the Contract, Guardian always ran the source code version in Toledo and Cleveland, Micronetics' obligation to provide support was terminated under § 5.3.

JA at 13.

On appeal, Guardian points to no evidence whatsoever to contradict Hayden's testimony that Guardian always used the source code version at its Toledo and Cleveland facilities. Rather, Guardian devotes nearly all of its argument to a discussion of how Micronetics failed to fulfill its support obligation under the Contract. For example, Guardian points to deposition excerpts and sworn affidavits submitted by various Guardian employees suggesting that Micronetics failed to provide necessary software upgrades, improperly delegated its support obligations to an unresponsive third party,[3] and ignored repeated inquiries regarding the central station software. According to Guardian. Micronetics' failure to fulfill its support obligations required Guardian ultimately to replace its entire computerized alarm monitoring system.

None of this evidence is relevant, however, to our determination of this case. Under the express terms of the Contract, Micronetics' support obligation terminated

---

**3.** In 1996, Micronetics assigned its support obligations under the Contract to a separate company known as ITI. *See Guardian Alarm Co. of Mich. v. May, et al.*, Case No. 96–525337–CK, at 2—3. As the district court

noted, however, ITI is not a party to this litigation and Micronetics does not contest its standing as party defendant to Guardian's complaint.

immediately when Guardian used the source code version of Genesis at any location other than its Detroit central station.[4] Contract §§ 5.3, 6.1(i). In light of the uncontradicted evidence that Guardian continually used the source code version of Genesis at its Toledo and Cleveland locations, we need not inquire into Micronetics' performance of its support obligations.[5]

## C. § 6.1(i) as "Confidentiality Provision"

■ Guardian contends on appeal that there are genuine issues of material fact as to whether Guardian violated the Contract's Detroit-only clause. Guardian asserts that section 6.1(i), which limits Guardian's use of the source code to its Detroit central station, is "plainly a confidentiality provision," and thus urges us to reject the district court's reliance on this clause inasmuch as "there is no claim that Micronetics has been harmed in any way by Guardian's running the source code at Toledo or Cleveland." Pl.-Appellant's Br. at 25. Nothing in the Contract supports this limited reading of section 6.1(i), however. In fact, the Contract could hardly be more clear: Micronetics' support obligation terminates immediately if Guardian uses the central station source code anywhere other than the company's Detroit offices. Because the language of the Con-

tract is not ambiguous or subject to more than one possible construction, Guardian may not contradict the Contract's plain meaning merely by asserting that the parties intended something else. *See Zurich Ins. Co. v. CCR and Co.*, 226 Mich.App. 599, 576 N.W.2d 392, 395 (1997) (invoking Michigan's parol evidence rule and granting summary judgment where contract was unambiguous).

## D. Waiver of Contract Rights

■ Guardian alternatively contends that Micronetics, by virtue of its own conduct, waived any defense based on the Detroit-only clause of the Contract. Under Michigan law, a waiver of a contractual right may be inferentially established where a party's conduct is inconsistent with a subsequent demand for strict performance. *See Fitzgerald v. Hubert Herman, Inc.*, 23 Mich.App. 716, 179 N.W.2d 252, 254 (1970). Here, Guardian claims that several factors relating to Micronetics' conduct support an inference that Micronetics waived any defense based on the Detroit-only provision of the Contract, including: (1) that the companies worked together on an ongoing basis to modify the source code version of Genesis; (2) that the companies shared employees; (3) that the presidents of the two companies were

---

4. Guardian also argues that the language in sections 5.1 and 6.2 of the Contract enable Guardian to modify the source code and oblige Micronetics to "use reasonable effort to provide support" for the modified source code. Pl.-Appellant's Br. at 14—15. In the alternative, Guardian argues that the provisions of sections 5 and 6 are ambiguous. *See id.* at 11. This interpretation, however, ignores the plain terms of sections 5.3 and 6.1(i). Guardian only had the discretion to use the source code at its Detroit central station, *see* Contract § 6.1(i); Micronetics' obligation to provide *any* support depended upon Guardian's compliance with section 5.3. Once Guardian used the source code at any other location in violation of section 5.3(i),

Micronetics' obligation to "use reasonable effort to provide support" under section 5.1 or 6.2 ceased.

5. Nor should we remand this case to permit additional discovery, as Guardian requests. Guardian has failed to explain how further discovery would produce evidence rebutting Hayden's admission that Guardian used the source code version of Genesis at Guardian's Toledo and Cleveland locations. *See Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 409 (6th Cir.1998) ("[The] nonmoving party must show how postponement of a ruling on the motion will enable him to rebut the motion for summary judgment." (citations omitted)).

brothers; (4) that Micronetics knew that Toledo and Cleveland were to be used as "demonstration sites;" and (5) that Micronetics knew that Guardian never used the object code version of the software at any of its sites.

■ Guardian's waiver argument fails for two reasons. First, under Michigan law, any "waiver of a breach of contract must be a 'voluntary, intentional relinquishment of a known right.'" *Bissell v. L.W. Edison Co.,* 9 Mich.App. 276, 156 N.W.2d 623, 627 (1968). None of the factors recited by Guardian demonstrates that Micronetics voluntarily and intentionally waived its right to terminate its support obligation if Guardian used the Genesis source code in violation of the Contract. To the contrary, in its brief on appeal, Guardian states that Micronetics "wrote to Guardian that it was no longer required to provide any support services to Guardian by reason of Guardian's alleged breaches of their contract." Pl.-Appellant's Br. at 6. Thus, Guardian appears to admit that Micronetics actively asserted its rights under the Contract, rather than waived them.

■ Moreover, Guardian never raised its waiver argument in the court below. As we have repeatedly noted in the past, "it is a long-standing principle of jurisprudence that an appellate court should not pass on issues not raised at the trial level." *In re Charfoos,* 979 F.2d 390, 395 (6th Cir.1992). This rule is "essential in order that the parties may have the opportunity to offer all the evidence they believe relevant to the issues ... [and] in order that litigants may not be surprised on appeal by a final decision there of issues upon which they have had no opportunity to introduce evidence." *Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (internal citation omitted). Accordingly, Guardian may not properly raise its waiver argument at this late stage of the litigation.

### E. Duty of Good Faith

■ Guardian's final argument on appeal is that Micronetics breached the implied duty of good faith imposed by Michigan law. Guardian argues that under the Contract, Micronetics had sole discretion to decide whether to implement Guardian's proposed modifications to Genesis or to provide support for Guardian's modified version of the software. Under Michigan law, when a party to a contract makes its obligations under the contract discretionary, that party is subject to the duty of good faith. *See Burkhardt v. City Nat'l Bank of Detroit,* 57 Mich.App. 649, 226 N.W.2d 678, 680 (1975). Because the question of whether a party has adhered to the duty of good faith is properly decided by the jury, *see Karibian v. Paletta,* 122 Mich.App. 353, 332 N.W.2d 484, 487 (1982), Guardian contends that the district court erred in granting summary judgment when genuine factual issues exist as to Micronetics' good faith performance of its discretionary duties.

■ As the district court clearly explained, however, the duty of good faith has no application where express contractual terms govern the parties' nondiscretionary rights and obligations. *See Stockdale v. Jamison,* 416 Mich. 217, 330 N.W.2d 389, 392 (1982) (duty of good faith is not implied where express terms of contract govern dispute). Here, the parties' obligations under the Contract were not matters of discretion, despite Guardian's assertions to the contrary. As previously discussed, section 5.3 unequivocally states that Micronetics' support obligation "shall terminate immediately" if Guardian violates its agreement to use only the object code version of the software, with the exception that Guardian was permitted to

use the source code version as provided in section 6. The Contract did not leave Micronetics' support obligation to Micronetics' discretion. Thus, the duty of good faith has no application in this case.

## III. CONCLUSION

Because we find that Micronetics' obligation to provide support services to Guardian terminated when Guardian used the source code version of Genesis at its Toledo and Cleveland locations, we need not address Micronetics' alternative argument that its liability is limited by the express terms of the Contract. For the foregoing reasons, therefore, we AFFIRM the judgment of the district court.