T.C. Memo. 2000-176


UNITED STATES TAX COURT


MARCOS ELISEO AND TEODORA C. ESCOBAR DE PAZ, ET AL.,[1] Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19401-98, 2358-99, 2743-99.            Filed May 26, 2000.


Marcos Eliseo Escobar de Paz, pro se in docket No. 19401-98.

Jose A. Batres, pro se in docket No. 2358-99.

Agustin Perez, pro se in docket No. 2743-99.

<u>Ric Hulshoff</u>, <u>Gary Slavett</u>, and <u>Jean Song</u>, for respondent.

_____

[1] Cases of the following petitioners are consolidated herewith: Jose A. and Dina Batres, docket No. 2358-99; and Agustin Perez and Isabel Sanchez, docket No. 2743-99.

MEMORANDUM OPINION

NAMEROFF, <u>Special Trial Judge</u>:  Respondent determined that petitioners in these consolidated cases are liable for deficiencies in Federal income tax as follows:

| Docket No. | Year | Amount |
|------------|------|--------|
| 19401-98 | 1996 | $22,389 |
| 2358-99 | 1995 | 2,679 |
| 2743-99 | 1996 | 3,659 |

Respondent also determined that petitioners in docket Nos. 19401-98 and 2743-99 were liable for the accuracy-related penalty under section 6662(a)[2] but has now conceded that issue.  After other concessions which will be detailed hereinafter, the issue to be resolved in these consolidated cases is whether part of the income earned by petitioner husbands from their trucking activity can be allocated to a leasing activity.  If we hold for petitioners on this issue, we must then decide whether petitioners' method of allocation or some other method is correct.

Some of the facts have been stipulated and are so found. The several stipulations of fact and attached exhibits are incorporated herein by reference.  At the time of the filing of the petitions herein, all petitioners resided in the State of California.

---

[2]  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.

Marcos Eliseo Escobar de Paz (Mr. Escobar) and Teodora C. Escobar de Paz filed a joint Federal income tax return for 1996 on which they reported wages of $25,851. The Escobars' 1996 return did not include a Schedule C, Profit or Loss from Business, or Schedule E, Supplemental Income or Loss, nor did it contain any schedule listing expenses. In the notice of deficiency, respondent determined that the Escobars had received unreported self-employment income of $64,481 resulting in the aforesaid deficiency of $22,389. Included therein was self-employment tax of $9,111, one-half of which was allowed as a deduction.

During 1996, Mr. Escobar received compensation of $64,481 from Shipper's Transport Express (Shipper's Transport) for transporting shipping containers with his own truck. The amount of wages reported on line 7 of the 1996 Escobar return reflects a reduction of the income from Shipper's Transport of $38,630. The parties have agreed that Mr. Escobar incurred business expenses of $28,947 in 1996 for the operation of his truck. Respondent is no longer contesting the identification of the income from Shipper's Transport as wage income and agrees that the imposition of the self-employment tax (and corresponding deduction) is erroneous. However, respondent contends that the entire amount of compensation received from Shipper's Transport is reportable as gross wages, and that the Escobars are entitled

to a deduction on Schedule A, Itemized Deductions, for unreimbursed employee business expenses of $28,947, subject to the limitations set forth in section 67(a).

Jose A. Batres (Mr. Batres) and Dina Batres filed their 1995 joint Federal income tax return and reported wage income of $18,327. Included in the return is a Schedule E for a "commercial tractor", on which the Batreses reported rents of $22,374 and expenses totaling $22,374, resulting in zero income or loss. In the notice of deficiency, respondent determined that the Batreses had unreported Schedule C income of $41,547[3] and allowable Schedule C expenses of $22,590. Wage income was reduced by $18,327. Respondent further determined that petitioners were liable for self-employment tax of $2,679, and $1,340 was allowed as a deduction for self-employment taxes. Mr. and Mrs. Batres have not contested the amount of income determined by respondent to have been received by Mr. Batres from his trucking operation. Respondent now does not contest that Mr. Batres' income was received as an employee, subject to the resolution of the lease activity issue, and the Batreses are entitled to a deduction on Schedule A for unreimbursed business

---

[3] This amount includes additional unreported income that was not reported as either wages or Schedule E rents on the 1995 return.

expenses of $22,590, subject to the limitations set forth in section 67(a).

Agustin Perez (Mr. Perez) and Isabel Sanchez (Ms. Sanchez) filed their 1996 Federal income tax return and reported wage income of $29,365. The Perez-Sanchez return includes a Schedule E which reports rents received ("lease value") of $42,238, offset by an equivalent amount of expenses. In the notice of deficiency, respondent determined that they had gross receipts for Schedule C of $71,603, allowed Schedule C business expenses of $42,895, determined further that Mr. Perez was liable for self-employment tax of $4,056, and allowed a self-employment tax deduction of $2,028. Again, respondent no longer contests the classification of employee, concedes the self-employment tax issues, and agrees that a deduction of $42,895 is allowable on Schedule A as a miscellaneous itemized deduction, subject to the section 67(a) limitation.

Each of petitioner husbands herein entered into an agreement with a trucking company regarding his working relationship. Mr. Escobar and Shipper's Transport entered into an agreement entitled "Owner-Operator Equipment Agreement" on February 10, 1995. In 1995, Mr. Batres entered into a contract with Calko Transport Co., Inc. (Calko). Mr. Perez, on October 23, 1995, entered into an agreement entitled "Lease and Subhaul Agreement with Independent Contractor" with Interstate Consolidation, Inc.,

(Interstate) as carrier. Shipper's Transport, Calko, and Interstate are hereinafter referred to collectively as the carriers. Messrs. Escobar, Batres, and Perez are collectively referred to as the owner-operators.

While the specific terms of the three documents vary, the general tenor is the same. Their purpose is to enable the carriers to obtain transportation services through the lease of tractor equipment owned by an independent contractor, said tractor to be furnished with a qualified driver. Each owner-operator purports to lease his tractor-truck to the carrier company. Each owner-operator warrants that the equipment will be in good condition, that he will place placards on the vehicle showing that it is operated by the carrier, that he agrees to operate the vehicle as an independent contractor, and that he will be responsible for all expenses necessary for the operation of the equipment. Compensation for the agreements will be paid by carriers in accordance with a schedule, not included in the record, but apparently reflecting an industrywide schedule of tariffs. (The Court understands that the compensation for transporting the cargo is generally divided 60-40 between the carrier and the owner-operator for standard size and distance hauls.) Under these agreements, the carrier assumes liability for bodily injuries to or the death of any person resulting from negligent operation, maintenance, or use of the equipment, but

the cost of this insurance is to be deducted from the compensation due to the owner-operator. Moreover, the owner-operator agrees to furnish insurance known as "bob-tail" insurance, pertaining to the operation of the tractor without a trailer. The terms of the agreements may be terminated by either party upon short notice.

Interstate is a trucking company or a freight forwarding company which transports goods from one point of origin to another point of origin. The company owns no trucks and contracts with independent contractors to perform the services. The operations of Shipper's Transport are similar.

An owner-operator is a service provider who either owns and drives his own truck or owns more than one truck and hires other drivers to drive one or more of them. In order to provide services to a carrier, an owner-operator must enter into a written agreement and qualify under various safety provisions dictated by the carrier, its insurance carrier, and government regulations. For example, Interstate offers insurance coverage to owner-operators that it uses. The insurance coverage offered by Interstate is effective only while the owner-operator is driving for the company. If an owner-operator is driving his tractor providing services to another company without the authorization of Interstate, the insurance provided by the carrier will not be effective. The trucks belonging to the

owner-operators are represented to Interstate's insurance carrier as leased trucks.

Petitioners contend that the owner-operators were engaged in two separate activities: (1) Leasing of their trucks to the carrier companies for a rental which is the equivalent of their expenses; and (2) providing the service of driving the trucks for wages. Respondent contends that petitioners engaged in a single activity; namely, providing transportation of cargo for the carriers by use of their own vehicle. In this context, we must determine whether the leases had independent significance so as to give rise to a separate business activity.

Labels used in formal written documents do not necessarily control the tax consequences of a given transaction. See Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). This Court may look to the substance of the transaction in order to determine the correct tax consequences. It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. See Gregory v. Helvering, 293 U.S. 465 (1935). Thus the fact that the documents state that the transactions are leases does not govern, and this Court must consider the substance of the transactions between the owner-operators and the carriers. After a careful review of this record, we conclude that petitioners did not engage in two

separate activities and that the lease activity had no independent significance for tax purposes.

A lease is defined as a "contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration." Black's Law Dictionary 898 (7th ed. 1999). In the instant cases, the carriers did not contract solely to use the owner-operators' trucks for a stipulated period of time for consideration. The carriers and owner-operators agreed to enter into a business relationship for the purpose of transferring cargo from one point to another using the latter's vehicles. The payments for the services provided were to be based upon published schedules relating to the weight of the cargo and the distance transferred. Petitioners were not paid for the use of their vehicles if they did not drive, and petitioners did not receive wages for driving if they did provide their own vehicles. As a practical matter, petitioners retained control of the use of their vehicles at all times and were responsible for all operating expenses. The carriers never acquired possession of the vehicles. It is true that each owner-operator was required to display the carrier's placard on the side of his truck while it was being used for that carrier, but the placard could be removed if the truck was to be used for other purposes. Moreover, there was no definite lease term. Petitioners were always free to use their trucks how and for whom

they wished, provided they removed the placards of any other company.  They could accept or reject loads as they wished.  They could earn as much or as little as wanted because they were free to use the equipment as much or as little as they wanted.

It is clear from this record that the leases only served the carriers' needs to comply with governmental regulations.  This regulatory scheme was put into place to protect the public by preventing common carriers from evading liability for accidents caused by the independent drivers.  See Zamalloa v. Hart, 31 F.3d 911, 913-914 (9th Cir. 1994); Empire Fire & Marine Ins. Co. v. Guaranteed Natl. Ins. Co., 868 F.2d 357, 362 (10th Cir. 1989); see also Prestige Cas. Co. v. Michigan Mut. Ins. Co., 99 F.3d 1340, 1342-1343 (6th Cir. 1996) (I.C.C. regulations that require every lease entered into by an I.C.C. licensed carrier contain a clause stating that the authorized carrier maintains "exclusive possession, control, and use of the equipment for the duration of the lease" promulgated to curb the abuse of carriers using leased vehicles to avoid safety regulations and to address public confusion as to who was financially responsible for the vehicles); 49 C.F.R. secs. 376.11 and 376.12 (1997).

It is also understandable that the leases served the practical purpose of ensuring adequate insurance coverage.  A carrier which engages the services of many owner-operators would have an administrative headache monitoring the adequacy (and

current existence) of the various insurance policies of the owner-operators. Therefore, it makes sense to try to cover as many as possible by blanket policies, under which insurance companies require that the insured have an ownership interest in the vehicle, which in turn is satisfied by the lease arrangement. However, in most if not all cases, the owner-operators pay for this insurance by having its cost deducted from their hauling proceeds.

Accordingly, we conclude that for income tax purposes the lease arrangements with the carriers had no independent economic significance, all the income the owner-operators received from the carriers was wage income, and the expenses pertaining to the operation of the trucks are deductible as itemized deductions on Schedule A, subject to the limitations of section 67(a).

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.