**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0643n.06

No. 11-1353

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jun 19, 2012**

LEONARD GREEN, Clerk

| | |
|---|---|
| GODWIN CHUNGAG; IRENE S. CHUNGAG, | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| WELLS FARGO BANK, N.A., d/b/a WELLS | ) COURT FOR THE EASTERN |
| FARGO HOME MORTGAGE, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendant-Appellee. | ) |

Before:     **KEITH, KETHLEDGE, DONALD, Circuit Judges.**

**PER CURIAM.**   This case arises out of a mortgage dispute.  Plaintiffs-Appellants, the Chungags, entered into a mortgage agreement in 1998 in connection with their purchase of a $250,000 house in Detroit.  To buy the house, they made a $50,000 down payment and executed a $200,000 promissory note, secured by a 30-year mortgage on the house, that required monthly payments of $1,264.14, due on the first of every month.  From 2006 to 2009, the Chungags made multiple payments in amounts well above their required monthly mortgage payment, and Wells Fargo used the excess money to reduce the amount of outstanding principal in the mortgage.  The Chungags stopped making payments in January 2010, and when Wells Fargo foreclosed on the house based on the Chungags' perceived default, the Chungags sued to prevent the sheriff's sale of their house.  The district court held that the Chungags had defaulted on the mortgage and dismissed their claims accordingly.  For the following reasons, we AFFIRM.

## I. BACKGROUND

On October 30, 1998, Godwin and Irene Chungag executed a mortgage for a house located at 525 Lodge Drive in Detroit, Michigan to secure a $200,000 note executed on the same day. The house was priced at $250,000, and the Chungags had made a $50,000 down payment before executing the mortgage. The 30-year mortgage provided for regular monthly payments, "with the full debt, if not paid earlier, due and payable on November 1, 2028."

Under the terms of the agreement, the Chungags were required to make monthly payments of $1,264.14 until the note matured on November 1, 2028. Between 2006 and 2009, the Chungags paid double the amount of their monthly payments each month, and they also made a large payment of $54,214.48 on July 7, 2007. Wells Fargo applied the excess amounts above the required monthly payment to the principal balance on the mortgage note. The Chungags stopped making monthly payments in early 2010, by which point they had built up substantial equity in the house. As of January 21, 2010, the outstanding principal balance on the mortgage loan was $89,188.41.

After the Chungags stopped making monthly mortgage payments, Wells Fargo declared them in default. On or around November 8, 2010, the Chungags received a Notice of Foreclosure Sale of their house, with the sheriff's sale scheduled for November 17, 2010. The Chungags filed this action in state court on November 15, 2010. Their complaint: (1) sought a stay of the sheriff's sale based on a request to quiet title because they did not believe they were in default; (2) alleged violations of the Michigan Consumer Protection Act; (3) alleged defamation; (4) alleged intentional infliction of emotional distress ("IIED"); (5) sought exemplary damages; and (6) alleged violations of the Fair

Debt Collection Practices Act. The case subsequently was removed to federal court based on diversity jurisdiction.

Once in federal court, on December 1, 2010, Wells Fargo moved to dismiss the complaint for failure to state a claim, attaching the mortgage agreement to support their motion. The district court heard oral argument on the motion on February 16, 2011, and entered an order granting the motion and dismissing the complaint on February 17, 2011. The Chungags timely appealed. The Chungags have not appealed the district court's dismissal of their defamation, Michigan Consumer Protection Act, and Fair Debt Collection Practices Act claims; they only appeal the dismissal of their claim based on quiet title, their IIED claim, and their claim for exemplary damages. We therefore limit our review to those claims.

## II. DISCUSSION

### A. Standard of Review

We review de novo the grant of a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6). *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011). Under Rule 12(b)(6), we must assume the plaintiffs' factual allegations are true and, construing the complaint in the light most favorable to the non-moving party, determine whether the complaint states a valid claim for relief. *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). To defeat a 12(b)(6) motion, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

**B.      Claim to Prevent Foreclosure**

In their complaint, the Chungags sought to prevent Wells Fargo from foreclosing on their house by seeking a declaration stating that they had not defaulted on the loan based on their multiple prior payments in amounts greater than the required monthly payment, and that there would be no default until the "outstanding principal balance on the loan is higher than the amount due under the amortization schedule of the loan." They styled this claim as a request to quiet title. There is no dispute that the Chungags were the fee owners of the property and that they signed a mortgage to secure repayment of the promissory note taken to purchase the house, so title is not the issue here. The only issue is whether the Chungags' failure to make monthly payments on the due dates for a period of time constitutes a default, which hinges on the language of the contract.

"In diversity cases, this court applies state law in accordance with the controlling decisions of the Michigan Supreme Court." *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1348 (6th Cir.1996) (citations omitted). We have described our approach to contract interpretation under Michigan law as follows:

> In Michigan, the proper interpretation of a contract is a question of law. . . . The goal of contract construction is to determine and enforce the parties' intent on the basis of the plain language of the contract itself. Michigan courts examine contractual language and give the words their plain and ordinary meanings. If the language of the contract is unambiguous, the court construes and enforces the contract as written. . . . Only when contract language is ambiguous does its meaning become a question of fact.
>
> A contract is ambiguous if its words may reasonably be understood in different ways. In other words, a contract is ambiguous when its provisions are capable of conflicting interpretations. Courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare ambiguity. Instead, contracts must be

construed so as to give effect to every word or phrase as far as practicable. However, courts may not impose an ambiguity on clear contract language.

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543-44 (6th Cir. 2007) (internal citations, emphasis, and brackets omitted).

The district court held that the plain language of the contract clearly states that a failure to make payments of $1,264.14 on the first day of each month constitutes a default, and that, having failed to do that, the Chungags were in default. The district court specifically highlighted several requirements from the mortgage contract that it believed clearly established that the Chungags had defaulted:

- The borrower "will pay principal and interest by making payments <u>every month</u>."

- The borrower "will make my monthly payments on the 1st day of <u>each month</u> beginning on DECEMBER 1, 1998."

- The borrower "will make these payments <u>every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal.</u>"

- The "<u>monthly payment </u>will be in the amount of U.S. $1,264.14.

- The borrower has "the right to make payments of principal at any time before they are due. A payment of principal only is known as a 'prepayment.'"

- When the borrower makes a prepayment, the borrower "<u>will tell the Note Holder in writing that I am doing so.</u>"

- The borrower "may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of [the borrower's] prepayments to reduce the amount of principal that [the borrower] owe[s] under this Note.

- • If [the borrower] makes "a partial prepayment, <u>there will be no changes in the due date or in the amount of [the borrower's] monthly payments unless the Note Holder agrees in writing to those changes.</u>"

- • If [the borrower] do[es] not pay <u>the full amount of each monthly payment on the date it is due, [the borrower] will be in default.</u>"

Reading these terms, the district court held that "[w]hether Plaintiffs' excess payments in 2006 through 2009 are considered 'prepayments' of principal does nothing to obviate the undisputed fact that Plaintiffs have not paid their monthly mortgage payments by their due date and are in default." "There is no contractual language that supports Plaintiffs' claim" that their excess payments should have been treated as "advance payments" instead of prepayments of principal. To the contrary, the district court observed, other provisions of the contract explicitly state that applying insurance or condemnation proceeds to reduce the principal balance "shall not extend or postpone the due date of the monthly payments" owed under the contract. With respect to prepayments, the contract also states, "If [the borrower] makes a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes."

The Chungags argue that this interpretation is "ludicrous and contrary to common sense," and is "an extraordinary and illogical proposition devoid of any support in logic or fact" because it would cause numerous people to default on their mortgage simply by making a late payment. They also argue that Wells Fargo had a "duty" to treat the excess payments as "advance payments" that "advanced the due date" to a date that "must be based on the amortization schedule." Finally, the Chungags argue that because the contract requires the borrower to state in writing that a certain payment is to be treated as a prepayment of principal, a failure to make such a statement in writing

requires an excess payment to be treated as an advance payment. Wells Fargo responds that "[t]here is nothing in the note—or in the mortgage—that requires, or even allows, Wells Fargo to treat excess payments made by plaintiffs as advance payments in the fashion plaintiffs now contemplate after the fact." Wells Fargo is correct.

The provisions highlighted by the district court, together with other provisions of the agreement, establish that the mortgage and note did not create a duty for Wells Fargo to treat the excess payments as advance payments. The Chungags offer no authority or contractual language that suggests that such a duty exists. To be sure, the contract requires the borrower to state in writing that he intends an excess payment to be treated as a prepayment of principal, and there is no evidence the Chungags made any such statement. Indeed, they deny making any such written statement. But the contract does not speak to what should happen when the borrower makes an excess payment without an accompanying written statement, and there is nothing in the contract that prohibits Wells Fargo from treating excess payments as prepayments, which is the most natural and logical course of action. Meanwhile, the contract unambiguously states that the borrower must make monthly payments of $1,264.14 on the first of the month to avoid default, and that the due dates of monthly payments will not change based on partial prepayments or other required payments. There is no dispute that the Chungags failed to make their monthly payments for a number of months. Accordingly, they are in default, and the district court properly dismissed their claim seeking to prevent the sheriff's sale of the house.

**C.      Claim for Intentional Infliction of Emotional Distress**

The Chungags' complaint also raised a state law tort claim for intentional infliction of emotional distress.  In Michigan, a plaintiff alleging IIED must allege (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.  *See Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010).  The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Walsh v. Taylor*, 689 N.W.2d 506, 517 (Mich. Ct. App. 2004) (quotations and citations omitted).  In Michigan, this standard is not satisfied when the plaintiff essentially claims that the defendant "breached contracts with him in various ways and foreclosed on his property." *Usery v. Option One Mortgage Corp.*, 2007 WL 2192657, *16 (Mich. Ct. App. July 31, 2007).  "In a contractual setting, a tort claim must be based instead on the breach of a duty distinct from the contract." *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273, 277 (Mich. Ct. App. 2004) (citation omitted).  The district court dismissed this claim, holding that "[p]laintiffs allege no facts that suggest any extreme or outrageous conduct" by Wells Fargo or "that would impose a duty on [Wells Fargo] that is distinct from its contractual obligations."

On appeal, the Chungags argue first that there has not been enough discovery "to determine the nature and scope of the emotional distress Plaintiffs have suffered."  But the extent of the distress does not matter unless the conduct itself was actionable under IIED.  To that end, they allege that Wells Fargo "intentionally reported false information on their credit, falsely claimed that Plaintiffs are in default and that [their] house would be sold and plaintiffs evicted," and that Wells Fargo

continued to "put daily notes" on the house, "take pictures of the house," and "continues to send [its] agents to the house to tell Plaintiffs' family that they should not be in the house." They offer no cases suggesting that this amounts to IIED. In response, Wells Fargo points out that the threshold for IIED is extremely high and that a defendant typically is not liable under IIED "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 909 (Mich. 1985). Wells Fargo is correct.

Although the facts of this case are unfortunate, the facts alleged in the complaint do not rise to the level of extreme, outrageous conduct on the part of Wells Fargo that, if proven true, would be actionable in tort in Michigan. *See Farah v. Bank of America, N.A.*, 2011 WL 2507881, *4 (Mich. Ct. App. June 23, 2011). The facts establish that Wells Fargo rightly believed that the Chungags were in default on their mortgage and initiated foreclosure proceedings thereafter. To be sure, it appears that Wells Fargo could have handled the matter more delicately, but the fact remains that the bank was within its rights to pursue foreclosure on the house. If the Chungags had not defaulted, it is possible that Wells Fargo's attempts to collect payments not actually owed to them through "[c]ontinuous unnecessary harassment" might be actionable. *See Margita v. Diamond Mortgage Corp.*, 406 N.W.2d 268, 271-73 (Mich. Ct. App. 1987). But that is not what happened here: Wells Fargo had a right to foreclose on the property and, in any event, the factual allegations do not evince a pattern of continuous unnecessary harassment that could be deemed sufficiently outrageous. Accordingly, the Chungags have failed to state a claim for IIED, *see Roberts*, 374 N.W.2d at 909, and the district court properly dismissed this claim.

**D.      Claim for Exemplary Damages**

The Chungags also raised a claim for exemplary damages.  The district court dismissed this claim, holding that Michigan law does not recognize a separate claim for exemplary damages.  It observed that exemplary damages are only available as a form of compensation for an injury.  The Chungags argue that Michigan courts have allowed a plaintiff to amend a complaint to add a claim for exemplary damages, citing *Sherrard v. Stevens*, 440 N.W.2d 2 (Mich. Ct. App. 1988).  Wells Fargo argues that there is no separate action for exemplary damages in Michigan law.  Wells Fargo is correct.

The district court correctly held that under Michigan law, exemplary damages are a form of damages, and do not constitute a separate cause of action.  *Kozma v. Chelsea Lumber Co.*, 2010 WL 2836327, *8 (Mich. Ct. App. July 20, 2010) ("[T]his Court notes that exemplary damages are a form of compensation for an injury and that they do not qualify as a cause of action.")  Indeed, *Sherrard*, the case cited by the Chungags, supports this conclusion.  440 N.W.2d at 5 ("[T]he amendment [allowing a prayer for exemplary damages] did not raise new factual allegations, but merely claimed new types of damages arising from the same set of factual allegations.").  Because there is no distinct claim for exemplary damages, this claim was properly dismissed.

### III.  CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED.